## Case No. 7,597.

### Ex parte KAINE.

[3 Blatchf. 1.] [1]

Circuit Court. S. D. New York. April 25. 1853.

EXTRADITION — ARREST UNDER COMMISSIONERS' WARRANT—HABEAS CORPUS—SUCCESSIVE WRITS —EFFECT OF SUPREME COURT DECISION ON COLLATERAL QUESTION— TREATY WITH GREAT BRITAIN.

1. The proceedings on a writ of habeas corpus in the federal courts are not governed by the laws of the states on the subject. but by the common law of England, as it stood at the adoption of the constitution. subject to such alterations as congress may see fit to prescribe.

[Cited in Re Morris. 40 Fed. 824.]

[Cited in U. S. v. Burdick, 1 Dak. 142, 46 N. W. 573.]

2. Under that system, a decision under one writ. refusing the discharge of a prisoner, is no bar to the issuing of any number of other successive writs by any court or magistrate having jurisdiction.

[Cited in Ex parte Cuddy. 40 Fed. 65.]

[Cited in Re Snell. 31 Minn. 112, 16 N. W. 693: People ex rel. Lawrence v. Brady, 56 N. Y. 192.]

3. Where the prisoner was arrested under an extradition treaty between the United States and Great Britain. and committed by a magistrate after examination. and then a habeas corpus was sued out by him before a circuit court of the United States, which, after a hearing. dismissed the writ and remanded the prisoner to be held under the commitment of the magistrate: Held, that the decision of such court was no bar to an inquiry by a justice of the supreme court of the United States. upon a habeas corpus issued by him, into the legality of the detention of the prisoner under said commitment.

[Cited in Re Henrich. Case No. 6,369: Re Macdonnell, Id. 8,772; Re Thomas. Id. 13,-887: U. S. v. Brawner, 7 Fed. 87.]

4. The views expressed by Mr. Justice Nelson in his opinion in Re Kaine, 14 How. [55

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

U. S.] 103, 129, as to the construction of the treaty between the United States and Great Britain, of August 9th, 1842 (8 Stat. 572, 576), and of the act of congress of March 3d, 1843, passed in pursuance thereof (5 Stat. 623), and as to the jurisdiction of the committing magistrate, and as to the competency of the evidence on which the prisoner was committed, applied to this case, and the prisoner discharged on habeas corpus, after a warrant had been issued by the department of state for his surrender to the British consul, to be carried back to Great Britain.

5. Considerations stated, why, under said treaty, a demand must first be made directly upon the government of the United States by the British government for the surrender of a fugitive, and the authority of the former government be obtained, before a warrant can be issued by a magistrate for the arrest of the fugitive.

[Cited in Re Henrich, Case No. 6,369; Re Macdonnell, Id. 8,771; Re Stupp, Id. 13,-563. Cited, contra, in Re Kelley, Id. 7,655. Cited in Ex parte Van Hoven, Id. 16,859; Castro v. De Uriarte, 12 Fed. 251, 16 Fed. 96.]

6. The proof before a magistrate, under a treaty of extradition, should, to warrant a commitment by him, be so full and satisfactory as to the commission of the offence charged, as, in his judgment, to authorize a conviction by him if he were sitting on the trial of the case.

[Disapproved in Re Farez, Case No. 4,645. Cited in Re McPhun, 30 Fed. 58.]

This was a habeas corpus before Mr. Justice Nelson, at chambers [on the part of Thomas Kaine]. For the report of the case in the supreme court, see In re Kaine, 14 How. [55 U. S.] 103.

James T. Brady, Richard Busteed, and Robert Emmet, for the prisoner.

Ambrose L. Jordan, for the British government.

NELSON, Circuit Justice. The prisoner was originally apprehended on the 15th of June, 1852, under a warrant issued by Commissioner Bridgham, under the treaty between the United States and Great Britain, of the 9th of August, 1842 (8 Stat. 572), on the application of Mr. Barclay, the British consul at the port of New York, upon a charge of assault upon James Balfe, in Ireland, with intent to murder. Upon hearing the allegations and proofs, the commissioner, on the 29th of June following, found him guilty of the charge, and directed that he be detained in custody, in pursuance of the provisions of the treaty, to abide the order of the president of the United States. On the 1st of July, a writ of habeas corpus was sued out by the prisoner, returnable before the United States circuit court for the Southern district of New York, the Honorable Samuel R. Betts, district judge, presiding, founded upon an alleged illegal detention under the warrant of the commissioner. Upon a return to the writ by the marshal, and a review of the proceedings that had taken place before the commissioner, the court, after consideration, held them to be legal and valid, and, on the 9th of the same month, dismissed the writ and remanded the prisoner to the custody of the marshal, under the previous order of commitment by the commissioner. [Case No. 7,598.] On the 17th of July following, the proceedings having been forwarded to the proper department at Washington, the acting secretary of state issued his warrant, directing that the prisoner be surrendered and delivered up to Mr. [Anthony] Barclay, her Britannic majesty's consul. At this stage of the proceedings, an application was made before me, at chambers, for a writ of habeas corpus, to bring up the prisoner, upon an alleged illegal detention and imprisonment, which I refused until the whole of the proceedings that had taken place before the commissioner and the circuit court should be laid before me. These were subsequently furnished, and, upon a full and careful examination, I became satisfied that the commissioner possessed no jurisdiction over the case, and that the proceedings were, in other respects, irregular and not warranted by law. But, instead of discharging the prisoner, differing in opinion, as I did, from my brother in the circuit court, and deeming some of the questions involved of sufficient magnitude and public interest to justify the submission of them to the highest judicial tribunal in the government, I adjourned the case to the next term of the supreme court of the United States, in conformity with the established practice in the king's bench of England in similar cases. [Case No. 7,597a.] That court, after argument and due consideration, and for reasons which were satisfactory to me, distinguished the adjournment of the case from chambers to the term from a similar proceeding in the king's bench, on account of the limited jurisdiction of the supreme court in respect to original proceedings, their powers being mainly appellate, and consequently dismissed the adjourned case for want of jurisdiction. The case was, however, presented to that court in another form. An application was made to it directly by the prisoner for a writ of habeas corpus, the application being accompanied by the proceedings that had taken place before the commissioner and the circuit court. But the questions involved failed to meet a judicial determination, in consequence of a serious diversity of opinion among the members of the court, a majority of my brethren not concurring in the interpretation to be given to the treaty and the act of congress passed in pursuance thereof, nor in respect to the jurisdiction of the commissioner under whose order the prisoner had been committed for the purpose of his surrender to the British authorities. The application was consequently denied, and an order entered dismissing the petition. The case before me, therefore, together with the questions involved on the return of the marshal to the writ of habeas corpus, which were adjourned to the supreme court, having been dismissed for want of jurisdiction, or rather not having been

entertained for want of it, necessarily remained for a final hearing at chambers, as the prisoner was in custody under the authority of that writ, and must continue in such custody until discharged, or else be remanded for the purpose of being dealt with as directed by the former commitment. The hearing at chambers upon the return was adjourned, accordingly, to the first Monday of this month, and the counsel on both sides, being advised thereof, have appeared and submitted their arguments upon the several questions arising in the case.

The learned counsel appearing on behalf of the British authorities has objected that the decision of Judge Betts, sitting in the circuit court, upon the return to the writ of habeas corpus before that court, it being a court of competent jurisdiction to hear and determine the question whether the commitment under the commissioner's order or warrant was legal or not, is conclusive, and a bar to any subsequent inquiry into the same matters by virtue of this writ. I do not so understand the law. The learned counsel has referred to Mercein v. People, 25 Wend. 64, as an authority. The question in that case arose under the statute of the state of New York regulating the proceedings upon the writ habeas corpus; and, if the decision there is as supposed, it would not be an authority to govern this case. The question there, however, which arose upon the proceedings of a father to obtain the possession of an infant child from the custody and care of the mother, who had separated from her husband, is not analogous. But the conclusive answer to this objection is, that the proceedings upon this writ in the federal courts are not governed by the laws and regulations of the states on the subject, but by the common law of England, as it stood at the adoption of the constitution, subject to such alterations as congress may see fit to prescribe (Ex parte Watkins, 3 Pet. [28 U. S.] 193; Ex parte Randolph [Case No. 11,558]); that, according to that system of laws, so guarded is it in favor of the liberty of the subject, the decision of one court or magistrate, upon the return to the writ, refusing to discharge the prisoner, is no bar to the issuing of a second or third or more writs, by any other court or magistrate having jurisdiction of the case; and that such court or magistrate may remand or discharge the prisoner, in the exercise of an independent judgment upon the same matters (Ex parte Partington, 13 Mees. & W. 679; Canadian Prisoners' Case, 5 Mees. & W. 32, 47; The King v. Suddis, 1 East, 306, 314; Burdett v. Abbott, 14 East, 91; Leonard Watson's Case, 9 Adol. & E. 731). In one of the cases referred to, the prisoner had obtained this writ from two of the highest common law courts of England, and also from the chief justice of the king's bench, at chambers, in succession, and their judgments had been given upon the cause of his imprison-

ment; and the learned judge, in delivering his opinion on the last application, alluding to the decisions on the former writs, refusing to discharge, observed, that this was no objection to the hearing on that occasion, as a subject in confinement had a right to call upon every court or magistrate in the kingdom, having jurisdiction of the matter, to inquire into the cause of his being restrained of his liberty. The decision, therefore, of the circuit court, upon a previous writ of habeas corpus obtained on behalf of the prisoner, refusing to discharge him, will not relieve me from inquiring into the legality of the imprisonment under the order of the commissioner, upon the present application.

The learned counsel also asked permission to argue the questions arising upon the construction of the treaty and of the act of congress passed in pursuance thereof, and upon the jurisdiction of the commissioner and the competency of the evidence before him upon which the prisoner was found guilty, inasmuch as those questions had not been argued before the supreme court on the side of the British government, as no counsel appeared, on that argument, in its behalf. The request was readily granted; and it is a matter of gratification to me, that I have had the benefit of the investigations and views of the learned counsel, in aid of the further consideration which I have been called upon to give to the very important and somewhat difficult questions involved in the final determination of the case. For, although, upon the further consideration of these questions, I am obliged to adhere to the opinions originally entertained, and which have been stated at large elsewhere, I am the more satisfied with their soundness, finding them unchanged after the able adverse argument submitted at the hearing. The opinions referred to, and which were concurred in by two of my learned brethren, the chief justice and Mr. Justice Daniel, led to the conclusions: 1. That the judiciary possess no jurisdiction to entertain proceedings, under the treaty, for the apprehension and committal of an alleged fugitive, without a previous requisition, made under the authority of Great Britain, upon the president of the United States, and his authority for the purpose; 2. That the United States commissioner, Mr. Bridgham, was not an officer, within the treaty or the act of congress, upon whom the power was conferred to hear and determine the question of criminality, upon which determination the surrender is to be made; 3. That there was no competent evidence before the commissioner, if he possessed the power, to authorize or warrant the finding of the offence charged. As I have already observed, the grounds upon which these conclusions were arrived at have been stated at large elsewhere, and I shall not, on the present occasion, repeat them. They are such as would have satisfied my mind, beyond all question or doubt, had it not been for the different opinions en-

tertained by four of my learned brethren, for whose judgment I entertain a sincere respect. Those opinions, however, not being the opinions of a majority of the court, and there having been a dismissal of the case without any decision upon the merits, I am left to follow out my own convictions and conclusions, in the final disposition to be made of it; and, being satisfied of the soundness of them, I must enforce them, till I am otherwise authoritatively instructed.

The practice of delivering up offenders charged with felony and other high crimes, who have fled from the country in which the crime has been committed into a foreign and friendly jurisdiction, is highly commendable, and sanctioned by the usages of international law. At the same time, it is a delicate power of government, which should be limited, and guarded with great care, to prevent abuses, and be exercised with the utmost deliberation and caution. The difficulty of entering into treaties for this purpose arises out of the character of the criminal codes of different nations, both as it respects the acts made penal by law, and the degree and mode of punishment annexed to offenses. An enlightened nation, with a criminal code ameliorated by the advance of civilization, would not enter into a treaty with a barbarous one, whose code was bloody and cruel. And, even among enlightened nations, the stipulations for surrender are cautiously limited to a few specified crimes, of atrocious character, against persons and property. The treaty of November 19th, 1794 (8 Stat. 116, 129), between this country and Great Britain, was confined to the crimes of murder and forgery. The present one of 1842 is more comprehensive, though still restricted, as is also the treaty with France, of November 9th, 1843 (8 Stat. 580, 582). Mr. Jefferson, in 1793, in a letter in reply to a demand by the French minister for the surrender of fugitives, observed: "The evil of protecting malefactors of every dye is as sensibly felt here as in other countries, but, until a reformation of the criminal codes of most nations, to deliver fugitives from them would be to become their accomplices."

Another objection to entering into these treaties is the difficulty of guarding against the abuse arising out of demands for the surrender of political offenders, under the form of some of the crimes enumerated in the treaty. In most instances, perhaps, of political offences, the acts, detached from the political character of the transaction, would bring the case within some of the offences enumerated; and, unless the government upon whom the demand is made takes the responsibility of distinguishing between the two, the treaty obligation would require the surrender. The surrender, in such cases, involves a political question, which must be decided by the political, and not by the judicial, powers of the government. It is a general principle, as it respects political questions concerning foreign governments, that the judiciary follows the determination of the political power, which has charge of its foreign relations, and is, therefore, presumed to best understand what is fit and proper for the interest and honor of the country. They are questions unfit for the arbitrament of the judiciary— especially so for the subordinate magistrates of the country. These questions growing out of political offences, greatly embarrass governments in canvassing the policy and expediency of entering into treaties of extradition, and, when they arise, are calculated to endanger the authority and force of such treaties. It was the apprehension of the people of this country, at the time, that the offence of Jonathan Robbins, who was delivered up under the treaty with Great Britain of 1794, was a political offense, which prevented a renewal of the stipulations from that time down to the present treaty of 1842, as it was claimed that he was an American citizen, and had been impressed on board of a British vessel, and that the crime was committed in rescuing himself from the hands of his oppressors. Assuming such apprehension to have been well founded, the intense public indignation that followed was creditable to the nation.

These considerations, thus briefly stated, (for I have not the time to enlarge upon them), show that treaties of extradition involve, in the execution of them, great national questions, which should be referred, in the first instance, to the political power of the nation, and which, under our system of government, belong to the executive, as the head of the nation, to decide. The instances of political offences, in which demands may be made by one nation upon another for a surrender of the offender, are by no means imaginary or cases of no practical application. The history of the times informs us that, at this day, more than one government on the continent of Europe is agitated with apprehension and alarm on this subject, and from which even the government of England seems not to have been entirely free. And, in our own country, how many political offenders, who have sought an asylum here from the disastrous struggles for liberty in the other hemisphere, might be pointed out, some of whom even might be the subject of a requisition under the very treaty in question.

These are some of the considerations that strongly urge the interpretation of the treaty before us for which I have heretofore contended, and the result of which has been already stated, and which is the one given to it by Great Britain in providing for its execution on her part. The demand by this government for the surrender of the fugitive must be first made directly upon that government, and its consent and authority be obtained, before the judiciary can be called into requisition. In my judgment, this is a sound construction of the language of the

treaty, and carries out the intention and policy of the high contracting parties. The case immediately before me may be one of comparative unimportance, as the fugitive demanded is an obscure and humble individual, and may even be the proper subject of surrender, under the treaty. But I cannot forget that the principles and rule of construction to be applied to him will be equally applicable to the case of a demand for the surrender of a political offender, and to all other cases falling within its provisions. I am, therefore, not at liberty to distinguish it, whatever may be the supposed merit of the application. I think the requisition should have been made, in the first instance, upon the executive, and his authority obtained, in order to warrant the interposition of the judiciary; and further, that the commissioner before whom the application was made, possessed no jurisdiction of the case, not being an officer within the treaty or the act of congress passed in pursuance thereof; and that the evidence in the case, upon which the offence was found, was incompetent, and hence did not warrant the finding of the magistrate. The proof, in all cases under a treaty of extradition, should be, not only competent, but full and satisfactory, that the offence has been committed by the fugitive in the foreign jurisdiction—sufficiently so to warrant a conviction, in the judgment of the magistrate, of the offence with which he is charged, if sitting upon the final trial and hearing of the case. No magistrate should order a surrender short of such proof.

The result is, that the prisoner is entitled to be discharged from imprisonment under the warrant or order of the commissioner, and, consequently, from arrest or confinement under the warrant issued by the acting secretary of state in pursuance thereof. But, as the discharge is in consequence of illegality in the proceedings under the treaty, and as the question of surrender is one of which I can entertain jurisdiction, I am ready to hear any further evidence on behalf of the application, which the representative of the British government may see fit to present.

The counsel for the British government not being prepared to furnish proof that any authority had been given by the president of the United States for the arrest of the prisoner, he was discharged.