Justice THOMAS, concurring.
I join the Court's opinion, which correctly concludes that respondent's Suspension Clause argument fails because he does not seek a writ of habeas corpus. I write separately to address the original meaning of the Suspension Clause, which guarantees that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Art. I, § 9, cl. 2. The Founders appear to have understood "[t]he Privilege of the Writ of Habeas Corpus" to guarantee freedom from discretionary detention, and a "suspen [sion]" of that privilege likely meant a statute granting the executive the power to detain without bail or trial based on mere suspicion of a crime or dangerousness. Thus, the expedited removal procedure in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009-546, is likely not a suspension.[1]
I
The writ of habeas corpus began as a prerogative writ in the Court of King's Bench in the 16th century. J. Baker, An Introduction to English Legal History 157 (5th ed. 2019). Over time, however, it came to be understood both as a right to be free from arbitrary detention and as a procedural writ.
By the end of the 16th century, the English connected the common-law writ of habeas corpus to liberty. Specifically, it was associated with the guarantee in Magna Carta that "[n]o free person (Nullus *1984 liber homo ) shall be taken or imprisoned, or disseised or outlawed or exiled, or in any way destroyed ... except by the lawful judgment of his peers or by the law of the land." Id. , at 157, n. 76, 506. Perhaps most prominently, Edward Coke wrote in his Institutes that "if a man be taken, or committed to prison contra legem terrae , against the Law of the land," then "[h]e may have an habeas corpus ." The Second Part of the Institutes of the Laws of England 55 (6th ed. 1681). For Coke, and for the many English (and later Americans) who read his work, "the writ was treated as an aspect of the Charter's guaranty." D. Meador, Habeas Corpus and Magna Carta: Dualism of Power and Liberty 22 (1966).
This association between habeas corpus and freedom from discretionary detention deepened after 1679 with the Habeas Corpus Act, also known as An Act for the better secureing the Liberty of the Subject and for Prevention of Imprisonments beyond the Seas. The statute sought to address "great Delayes" in "criminall or supposed criminall Matters." 31 Car. 2, ch. 2. It required an officer served with a writ of habeas corpus to produce the prisoner within three days in "any such criminall or supposed criminall Matters." Ibid. It also guaranteed bail to prisoners in cases of felony or high treason if they were not tried within one term of court. Ibid. To protect these rights, Parliament created a special statutory remedy: All writs under the Habeas Corpus Act were marked as issuing pursuant to the statute. Ibid. ; P. Halliday, Habeas Corpus: From England to Empire 320 (2010).
Parliament passed the Habeas Corpus Act to curb the power of King Charles II, but it nonetheless came to be seen as a protection for liberty, not just an assertion of the powers of Parliament over the Crown. Henry Care, in the 1774 edition of his widely read treatise English Liberties, commented that "before this statute [the common-law writ of habeas corpus] was rendered far less useful than it ought to be, partly by the Judges pretending a power to grant or deny the said writ at their pleasure, in many cases; and especially by the ill practices of Sheriffs and Goalers, by putting the prisoner to the charge and trouble of ... a second and third writ, before they would obey the first." 1 English Liberties, or the Free-born Subject's Inheritance 195. The Habeas Corpus Act, he concluded, "provides thus for our liberty." Id., at 198. William Blackstone put it even more sweepingly, writing that the Habeas Corpus Act "is frequently considered as another magna carta ." 3 Commentaries on the Laws of England 135 (1770).
II
The Founders inherited this understanding of habeas corpus. And they enshrined it in the Suspension Clause, which they understood to protect a substantive right.
The language of the Suspension Clause evinces this understanding. The Clause itself does not authorize courts to issue writs of habeas corpus. INS v. St. Cyr , 533 U.S. 289, 337, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (Scalia, J., dissenting); Ex parte Bollman , 4 Cranch 75, 94, 8 U.S. 75, 2 L.Ed. 554 (1807). Nor does it refer simply to the writ of habeas corpus. Rather, it protects the privilege of the writ of habeas corpus. The word "privilege" was "used interchangeably with the words 'rights,' 'liberties,' and 'freedoms,' and had been since the time of Blackstone." McDonald v. Chicago , 561 U.S. 742, 813, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (THOMAS, J., concurring in part and concurring in judgment). By using this term, the Framers appear to have had a substantive right in mind.
Ratification debates reflect this understanding as well. Future Supreme Court *1985 Justice James Iredell said in the North Carolina convention that, "[b]y the privileges of the habeas corpus , no man can be confined without inquiry; and if it should appear that he has been committed contrary to law, he must be discharged." 4 Debates in the Several State Conventions 171 (J. Elliot ed. 1891). Signer of the Constitution James McHenry told the Maryland House of Delegates that "[p]ublic safety may require a suspension of the Ha[beas] Corpus in cases of necessity: when those cases do not exist, the virtuous Citizen will ever be protected in his opposition to power." 11 Documentary History of the Ratification of the Constitution 80, 84 (J. Kaminski et al. eds. 2015) (Documentary History).
This understanding is echoed in statements that the Constitution protects the Habeas Corpus Act, the writ of habeas corpus, or simply "the habeas corpus," all referring to a substantive right. Alexander Hamilton wrote in The Federalist No. 83 that "the habeas corpus act" was "provided for in the most ample manner in the plan of the convention." The Federalist No. 83, p. 499 (C. Rossiter ed. 1961). Again in No. 84, he wrote that the Constitution "establish[ed] the writ of habeas corpus ." Id. , No. 84, at 511. In the Pennsylvania ratifying convention, Jasper Yeates said that the Suspension Clause "direct[ed] that the privilege of the habeas corpus act shall not be suspended except in times of immediate danger." 2 Documentary History 434-435 (M. Jensen ed. 1976). In Virginia, Governor Edmund Randolph-a signer and future Attorney General-argued that "the habeas corpus is at least on as secure and good a footing as it is in England" because "[t]hat privilege is secured here by the Constitution." 9 id. , at 1099 (J. Kaminski & G. Saladino eds. 1990). Luther Martin of Maryland wrote that "the general government is to have a power of suspending the habeas corpus act , in cases of rebellion or invasion. " Genuine Information VIII, reprinted in 15 id. , at 434 (J. Kaminski & G. Saladino eds. 1984). In Massachusetts, Theophilius Parsons "made a Loud Speech on the Habeas Corpus act that it will not be in the power of Gov[ern]ment to suspend the act only in time of war." 7 id. , at 1813 (J. Kaminski & G. Saladino eds. 2001). Other speakers and writers made similar references. See A. Tyler, Habeas Corpus in Wartime 132-133 (2017) (collecting examples). In sum, it seems that the founding generation viewed the privilege of the writ of habeas corpus as a freedom from arbitrary detention.[2]
*1986 III
The remaining question is what it means for "[t]he Privilege of the Writ of Habeas Corpus" to "be suspended." U. S. Const., Art. I, § 9, cl. 2. At the founding, suspension was a well-known term that meant "a [t]emporal [s]top of a [m]an's [r]ight." N. Bailey, An Universal Etymological English Dictionary (22d ed. 1770); see St. Cyr , 533 U.S. at 337-338, 121 S.Ct. 2271 (Scalia, J., dissenting). In the context of habeas corpus, it appears to have specifically meant a grant of authority to the executive to detain without bail or trial based on suspicion of a crime or dangerousness.
The English understood the term this way. Blackstone called it "the happiness of [the English] constitution" that "the parliament only, or legislative power, ... can authorize the crown, by suspending the habeas corpus act for a short and limited time, to imprison suspected persons without giving any reason for so doing." 1 Commentaries on the Laws of England, at 136. Bills known as suspensions granted broad power to detain based on suspicion of a crime. For example, in 1777, Lord Germaine introduced a bill " 'to empower his Majesty to secure and detain Persons charged with, or suspected of, the Crime of High Treason committed in North America, or on the High Seas, or the Crime of Piracy.' " 19 W. Cobbett, The Parliamentary History of England 4 (1814). The bill allowed certain prisoners to be detained " 'without bail or mainprize' "[3] and prohibited any " 'judge or justice of peace' " from " 'bail[ing] or try[ing] any such person or persons, ... any law, statute, or usage, to the contrary in any wise notwithstanding.' " Id., at 5. The text contained no mention of the Habeas Corpus Act, but it nevertheless was referred to as a "suspension of the Habeas Corpus Act." Id., at 9-10. As one historian has written, suspensions "were officially acts 'empowering his majesty to apprehend and detain such persons as he shall find cause to suspect' " and to do so " 'without bail or mainprise.' " Halliday, Habeas Corpus, at 248.
Americans shared a similar understanding, as evidenced by the suspensions that States passed during the Revolutionary War. "By their common terms," these suspensions "bestowed authority on state executives to arrest and detain persons preventively based on suspicion of supporting the Crown." Tyler, Habeas Corpus in Wartime, at 111. In 1777, Massachusetts authorized the detention of "any person whom the council shall deem the safety of the Commonwealth requires should be restrained of his personal liberty, or whose enlargement within this state is dangerous thereto" "without bail or mainpri[s][z]e." 1776-1777 Mass. Acts ch. 45, §§ 1, 3, p. 641. Virginia similarly allowed the Governor and council to detain anyone "whom they may have just cause to suspect of disaffection to the independence of the United States or of attachment to their enemies." An act for giving certain powers to the governour and council, and for punishing those who shall oppose the execution of laws, reprinted in 10 W. Hening's Statutes at Large 413-414 (1822). And New York created a board with power "to apprehend and confine or cause to be apprehended or confined ... all persons whose going at large shall in the judgment of the said commissioners or any three of them appear dangerous to the safety of *1987 this State." An Act appointing commissioners for detecting and defeating conspiracies and declaring their powers (Feb. 5, 1778), 1778 N. Y. Laws ch. 3, pp. 8-9; see also An Act for constituting a Council of Safety (Oct. 11, 1777), 1777 N. J. Laws ch. 40, § 4, p. 85; An Act to Empower the Supreme Executive Council of this Commonwealth to Provide for the Security Thereof in Special Cases Where No Provision Is Already Made by Law (Sept. 6, 1777), ch. 762, § 2, 9 Statutes at Large of Pennsylvania 140 (J. Mitchell & H. Flanders eds. 1903); An Act to punish certain crimes and misdemeanors, and to prevent the growth of toryism, 1777 Md. Laws ch. 20, § 7.[4]
Massachusetts continued using this formula for suspensions under its 1780 Constitution. These suspensions are especially probative because that Constitution contained language similar to the Federal Suspension Clause: "The privilege and benefit of the writ of habeas corpus shall be enjoyed in this Commonwealth in the most free, easy, cheap, expeditious and ample manner; and shall not be suspended by the Legislature, except upon the most urgent and pressing occasions, and for a limited time not exceeding twelve months." Pt. 2, ch. VI, Art. VII. In response to Shays' Rebellion, which gained notoriety across the United States, Massachusetts passed "An Act for Suspending the Privilege of the Writ of Habeas Corpus." It provided that
"the Governor, with the advice and consent of the Council, be and he hereby is authorised and empowered ... to command, and cause to be apprehended, and committed in any Goal, or other safe place, within the Commonwealth, any person or persons whatsoever, whom the Governor and Council, shall deem the safety of the Commonwealth requires should be restrained of their personal liberty, or whose enlargement is dangerous thereto; any Law, Usage or Custom to the contrary notwithstanding." 1786-1787 Mass. Acts ch. 41, p. 102.
The Act also provided that "any Person who shall be apprehended and imprisoned, as aforesaid, shall be continued in imprisonment, without Bail or Mainprize, until he shall be discharged therefrom by order of the Governor, or of the General Court." Id., at 103; see also An Act to Suspend the Privilege of the Writ of Habeas Corpus for Six Months (June 27, 1782), 1782-1783 Mass. Acts ch. 2, pp. 6-7. Thus, in a jurisdiction with an analog to the Suspension Clause, a suspension was a grant of power to detain without bail or trial based on suspicion of a crime or dangerousness.
Although the ratification debates are not especially illuminating on the meaning of a suspension, they provide further support for this understanding. Luther Martin wrote that the Government, upon "suspending the habeas corpus act may seize upon the persons of those advocates of freedom , who have had virtue and resolution enough to excite the opposition, and may imprison them during its pleasure." Genuine Information VIII, reprinted in 15 Documentary History 434. Another essayist, writing in a Boston newspaper, explained that suspension would allow "the President, or President and Senate, as Congress shall think proper to empower, to take up and confine for any cause, or for any suspicion, or for no cause, perhaps any person, he or they shall think proper. 5 id. , at 712 (J. Kaminski & G. Saladino eds. 1998).
*1988 In sum, a suspension was not necessarily an express limitation on the availability of the writ of habeas corpus. Rather, it appears to have been a grant of power to detain based on suspicion of a crime or dangerousness without bail or trial.
IV
Under this interpretation, 8 U.S.C. § 1252 likely does not suspend the writ of habeas corpus. To be placed in expedited removal, an immigration officer must "determin[e]" that an alien is "inadmissible." § 1225(b)(1)(A)(i). That determination is based in part on the alien's lack of valid entry documentation and failure to satisfy a 2-year continuous physical presence requirement, not on mere suspicion or dangerousness. §§ 1225(b)(1)(A)(i), (iii)(II) ; § 1182(a)(7). An alien has the opportunity to avoid expedited removal by demonstrating a "credible fear of persecution." §§ 1225(b)(1)(B)(iii), (v). If the alien is unsuccessful, he may seek "[j]udicial review ... in habeas corpus proceedings" of "whether [he] is an alien"; "whether [he] was ordered removed" under expedited removal; and "whether [he] can prove by a preponderance of the evidence that [he] is an alien lawfully admitted for permanent residence, has been admitted as a refugee ..., or has been granted asylum" and "such status [has not] been terminated." § 1252(e)(2).
This statute bears little resemblance to a suspension as that term was understood at the founding. It does not allow the executive to detain based on mere suspicion of a crime or dangerousness. Rather, it requires a finding that the detainee lacks valid documentation and is not eligible for asylum. It even expressly permits habeas relief for a detainee who does not meet certain criteria for expedited removal.
Some may wish that the Suspension Clause were broader. Perhaps for this reason, our precedents have departed from the original understanding of the Suspension Clause. See, e.g. , Boumediene v. Bush , 553 U.S. 723, 826-850, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (Scalia, J., dissenting); St. Cyr , 533 U.S. at 336-341, 121 S.Ct. 2271 (Scalia, J., dissenting). But this understanding does contain an important guarantee of individual liberty by limiting the circumstances in which Congress may give the executive power to detain without bail or trial based on suspicion of a crime or dangerousness. In this case, that guarantee has not been violated.
Justice BREYER, with whom Justice GINSBURG joins, concurring in the judgment.
The statute at issue here, 8 U.S.C. § 1252(e)(2), sets forth strict limits on what claims a noncitizen subject to expedited removal may present in federal habeas corpus proceedings. I agree that enforcing those limits in this particular case does not violate the Suspension Clause's constitutional command: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U. S. Const., Art. I, § 9, cl. 2. But we need not, and should not, go further.
We need not go further because the Government asked us to decide, and we agreed to review, an issue limited to the case before us. The question presented is "whether, as applied to respondent , Section 1252(e)(2) is unconstitutional under the Suspension Clause." Pet. for Cert. i (emphasis added). All we must decide is whether, under the Suspension Clause, the statute at issue "is unconstitutional as applied to this party, in the circumstances of this case." Chicago v. Morales , 527 U.S. 41, 74, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (Scalia, J., dissenting).
*1989 Nor should we go further. Addressing more broadly whether the Suspension Clause protects people challenging removal decisions may raise a host of difficult questions in the immigration context. What review might the Suspension Clause assure, say, a person apprehended years after she crossed our borders clandestinely and started a life in this country? Under current law, noncitizens who have lived in the United States for up to two years may be placed in expedited-removal proceedings, see § 1225(b)(1)(A)(iii), but Congress might decide to raise that 2-year cap (or remove it altogether). Does the Suspension Clause let Congress close the courthouse doors to a long-term permanent resident facing removal? In INS v. St. Cyr , 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), we avoided just that "serious and difficult constitutional issue." Id. , at 305, 121 S.Ct. 2271.
Could Congress, for that matter, deny habeas review to someone ordered removed despite claiming to be a natural-born U. S. citizen? The petitioner in Chin Yow v. United States , 208 U.S. 8, 28 S.Ct. 201, 52 L.Ed. 369 (1908), and others have faced that predicament. See also § 1252(e)(2)(A) (permitting, at present, habeas review of citizenship claims). What about foreclosing habeas review of a claim that rogue immigration officials forged the record of a credible-fear interview that, in truth, never happened? Or that such officials denied a refugee asylum based on the dead-wrong legal interpretation that Judaism does not qualify as a "religion" under governing law? Cf. Tod v. Waldman , 266 U.S. 113, 119-120, 45 S.Ct. 85, 69 L.Ed. 195 (1924) (observing that immigration officials ignored a Jewish family's claim that they were "refugees" fleeing "religious persecution").
The answers to these and other "difficult questions about the scope of [Suspension Clause] protections" lurk behind the scenes here. Lozman v. Riviera Beach , 585 U. S. ----, ----, 138 S.Ct. 1945, 1953, 201 L.Ed.2d 342 (2018). I would therefore avoid making statements about the Suspension Clause that sweep beyond the principles needed to decide this case-let alone come to conclusions about the Due Process Clause, a distinct constitutional provision that is not directly at issue here. Compare ibid. (concluding that, with narrow grounds for decision available, resolving broader, more difficult questions "must await a different case") with ante , at 1969 - 1972 (suggesting that removal is simply not the sort of "restraint" for which the Suspension Clause guarantees a means of "securing release"), and ante , at 1981 - 1983 (addressing a separate due process question).
As for the resolution of the dispute before us, Congress, in my view, had the constitutional power to foreclose habeas review of the claims that respondent has pressed in this case. Habeas corpus, as we have said, is an "adaptable remedy," and the "precise application and scope" of the review it guarantees may change "depending upon the circumstances." Boumediene v. Bush , 553 U.S. 723, 779, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) ; see also id. , at 813, 128 S.Ct. 2229 (ROBERTS, C. J., dissenting). So where the Suspension Clause applies, the "habeas court's role" may prove more "extensive," or less so, depending on the context at issue. Id. , at 780, 128 S.Ct. 2229 (majority opinion). Here, even assuming that the Suspension Clause guarantees respondent some form of habeas review-which is to say, even accepting for argument's sake that the relief respondent seeks is "release," contra, ante , at 1975-the scope of that constitutionally required review would not extend to his claims. Two features of this case persuade me.
*1990 First , respondent's status suggests that the constitutional floor set by the Suspension Clause here cannot be high. A Border Patrol agent apprehended respondent just 25 yards inside the border. Respondent was placed in expedited removal proceedings shortly thereafter, where he received the same consideration for relief from removal that Congress has afforded persons arriving at the border. Respondent has never lived in, or been lawfully admitted to, the United States.
To my mind, those are among the "circumstances" that inform the "scope" of any habeas review that the Suspension Clause might guarantee respondent. Boumediene , 553 U.S. at 779, 128 S.Ct. 2229. He is thus in a materially different position for Suspension Clause purposes than the noncitizens in, for example, Rowoldt v. Perfetto , 355 U.S. 115, 78 S.Ct. 180, 2 L.Ed.2d 140 (1957), United States ex rel. Accardi v. Shaughnessy , 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), Bridges v. Wixon , 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), and Hansen v. Haff , 291 U.S. 559, 54 S.Ct. 494, 78 L.Ed. 968 (1934). They had all lived in this country for years. The scope of whatever habeas review the Suspension Clause assures respondent need not be as extensive as it might for someone in that position.
Second , our precedents demonstrate that respondent's claims are of the kind that Congress may, consistent with the Suspension Clause, make unreviewable in habeas proceedings. Even accepting respondent's argument that our "finality era" cases map out a constitutional minimum, see ante , at 1975 - 1976, his claims, on the facts presented here, differ significantly from those that we reviewed throughout this period.
To begin, respondent concedes that Congress may eliminate habeas review of factual questions in cases like this one. See, e.g. , Nishimura Ekiu v. United States , 142 U.S. 651, 660, 12 S.Ct. 336, 35 L.Ed. 1146 (1892). He has thus disclaimed the "right to challenge the historical facts" found by immigration officials during his credible-fear process. Tr. of Oral Arg. 44. But even though respondent has framed his two primary claims as asserting legal error, substance belies that label. Both claims are, at their core, challenges to factual findings.
During his credible-fear interview, respondent said that he is an ethnic Tamil from Sri Lanka and that, one day, a group of men abducted him in a van and brutally beat him. App. 67, 70-74. The asylum officer believed respondent's account, id. , at 83, which respondent confirmed was his sole basis for seeking relief, id. , at 77, 79. The critical question, then, concerned the nature of the attack: Who attacked respondent and why? In written findings, the asylum officer concluded that it was "unknown who these individuals were or why they wanted to harm [respondent]." Id. , at 87. Based on those findings, the asylum officer determined that respondent had not established a credible fear of persecution or torture within the meaning of governing law. See id. , at 87, 89.
Respondent, to be sure, casts the brunt of his challenge to this adverse credible-fear determination as two claims of legal error. But it is the factual findings underlying that determination that respondent, armed with strong new factual evidence, now disputes. See id. , at 23-27; Brief for Professors of Sri Lankan Politics as Amici Curiae 7-11; see also ante , at 1983, n. 28 (noting that immigration officials may revisit their findings in light of this additional evidence).
Respondent first asserts that the asylum officer failed to apply-or at least misapplied-the applicable legal standard under § 1225(b)(1)(B)(v), which required only a "significant possibility" that respondent *1991 could establish entitlement to relief from removal. See App. 30-32; Brief for Respondent 6. Respondent also contends that the asylum officer "demonstrated a fatal lack of knowledge" about conditions in Sri Lanka, id ., at 7, in violation of provisions requiring that asylum officers consider "other facts as are known to the officer," § 1225(b)(1)(B)(v), and have "had professional training in country conditions," § 1225(b)(1)(E)(i). See App. 24-26, 28-29, 31.
At the heart of both purportedly legal contentions, however, lies a disagreement with immigration officials' findings about the two brute facts underlying their credible-fear determination-again, the identity of respondent's attackers and their motive for attacking him. Other than his own testimony describing the attack, respondent has pointed to nothing in the administrative record to support either of these claims.
As to his legal-standard claim, respondent does not cite anything affirmatively indicating that immigration officials misidentified or misunderstood the proper legal standard under § 1225(b)(1)(B)(v). Rather, he argues that their credible-fear determination was so egregiously wrong that it simply must have rested on such a legal error. See Tr. of Oral Arg. 46-50. But that contention rests on a refusal to accept the facts as found by the immigration officials. Specifically, it rejects their findings that no evidence suggested respondent was attacked by men affiliated with the Sri Lankan Government and motivated by respondent's Tamil ethnicity or (as he now alleges) history of political activism. See App. 87; see also, e.g. , id. , at 23-26. Respondent's quarrel, at bottom, is not with whether settled historical facts satisfy a legal standard, see Guerrero-Lasprilla v. Barr , 589 U. S. ----, ----, 140 S.Ct. 1062, 1068-1069, 206 L.Ed.2d 271 (2020), but with what the historical facts are .
Respondent's country-conditions claim is much the same. Respondent does not cite anything in the administrative record affirmatively indicating that, contrary to §§ 1225(b)(1)(B)(v) and (E)(i), immigration officials, for example, consciously disregarded facts presented or otherwise known to them, or that the asylum officer never received relevant professional training. Instead, respondent offers a similar refrain: The credible-fear determination was so egregiously wrong that immigration officials simply must not have known about conditions in Sri Lanka. See Brief for Respondent 7. So this claim, too, boils down to a factual argument that immigration officials should have known who respondents' attackers were and why they attacked him.
Mindful that the "Constitution deals with substance, not shadows," Salazar v. Buono , 559 U.S. 700, 723, 130 S.Ct. 1803, 176 L.Ed.2d 634 (2010) (ROBERTS, C. J., concurring) (internal quotation marks omitted), I accordingly view both claims as factual in nature, notwithstanding respondent's contrary characterization. For that reason, Congress may foreclose habeas review of these claims without running afoul of the Suspension Clause. See, e.g. , Nishimura Ekiu , 142 U.S. at 660, 12 S.Ct. 336.
The other two claims of error that respondent has pressed assert that immigration officials violated procedures required by law. He first contends that, by not asking additional questions during the credible-fear interview, the asylum officer failed to elicit "all relevant and useful information," in violation of 8 C.F.R. § 208.30(d) (2020). See App. 27, 31. Respondent further alleges that translation problems arose during the interview, in violation of the asylum officer's duty under §§ 208.30(d)(1) and (2) to ensure that respondent *1992 was "[a]ble to participate effectively" and "ha[d] an understanding of the credible fear determination process." See App. 27-28, 31. Though both claims may reasonably be understood as procedural, they may constitutionally be treated as unreviewable-at least under the border-entry circumstances present in this case. See supra, at 1989 - 1990.
Respondent's procedural claims are unlike those that we reviewed in habeas proceedings during the finality era. Throughout that period, the procedural claims that we addressed asserted errors that fundamentally undermined the efficacy of process prescribed by law. See Chin Yow , 208 U.S. at 11, 28 S.Ct. 201 (observing that a noncitizen could obtain habeas relief on procedural grounds if he was denied "an opportunity to prove his right to enter the country, as the statute meant that he should have"). Many of our finality era cases thus dealt with situations in which immigration officials failed entirely to take obligatory procedural steps.
In Waldman , for example, we faulted immigration officials for making "no finding[s]" at all on potentially dispositive issues, including whether the noncitizens were fleeing religious persecution and therefore exempt from a literacy requirement. 266 U.S. at 120, 45 S.Ct. 85. And in United States ex rel. Johnson v. Shaughnessy , 336 U.S. 806, 69 S.Ct. 921, 93 L.Ed. 1054 (1949), we reversed for procedural error because the noncitizen was denied outright "the independent [medical] review and reexamination" required by then-governing law. Id. , at 812, 69 S.Ct. 921 ; see also Accardi , 347 U.S. at 267, 74 S.Ct. 499 (faulting the Attorney General for short-circuiting altogether legally prescribed adjudication procedures by "dictating" an immigration decision himself).
Respondent's procedural claims are different. He does not allege that immigration officials, say, denied him a credible-fear interview or skipped a layer of intra-agency review altogether. Nor do his allegations suggest that the asylum officer's questioning or the interpreter's translation constructively deprived him of the opportunity to establish a credible fear; indeed, he has consistently maintained that the information that was elicited more than sufficed. See, e.g. , Tr. of Oral Arg. 46-48; cf. Chin Yow , 208 U.S. at 13, 28 S.Ct. 201 (observing that "the denial of a hearing cannot be established" merely "by proving that the decision was wrong"). Respondent thus contends that the credible-fear process was procedurally defective for reasons that are more technical. He alleges that additional questions would have yielded further "relevant and useful" information and that "communication issues affected the interview" in some way. App. 27.
Respondent's procedural claims consequently concern not the outright denial (or constructive denial) of a process, but the precise way in which the relevant procedures were administered. They raise fine-grained questions of degree-i.e. , whether the asylum officer made sufficiently thorough efforts to elicit all "relevant and useful information" and whether he took sufficiently thorough precautions to ensure that respondent was "[a]ble to participate effectively" in the interview. 8 C.F.R. § 208.30(d).
Reviewing claims hinging on procedural details of this kind would go beyond the traditionally "limited role" that habeas has played in immigration cases similar to this one-even during the finality era. St. Cyr , 533 U.S. at 312, 121 S.Ct. 2271. To interpret the Suspension Clause as insisting upon habeas review of these claims would require, by constitutional command, that the habeas court make indeterminate and highly record-intensive judgments on matters of degree. Respondent has not cited, *1993 and I have not found, any case of ours suggesting that the Suspension Clause demands parsing procedural compliance at so granular a level. Neither, apparently, has the Solicitor General. See Tr. of Oral Arg. 14-15, 23-24; Brief for Petitioners 38.
Together with respondent's status, see supra , at 1989 - 1990, these characteristics convince me that Congress had the constitutional power to foreclose habeas review of respondent's procedural claims. Recasting those claims as an allegation that respondent's "due process rights were violated by" immigration officials makes no material difference. App. 32. That alternative description changes none of the features that, in my view, put respondent's procedural claims beyond the scope of any minimum habeas review that the Suspension Clause might assure him under the circumstances.
* * *
For these reasons, I would hold that, as applied to respondent, § 1252(e)(2) 's limits on habeas review do not violate the Suspension Clause. I would go no further.
Justice SOTOMAYOR, with whom Justice KAGAN joins, dissenting.
The majority declares that the Executive Branch's denial of asylum claims in expedited removal proceedings shall be functionally unreviewable through the writ of habeas corpus, no matter whether the denial is arbitrary or irrational or contrary to governing law. That determination flouts over a century of this Court's practice. In case after case, we have heard claims indistinguishable from those respondent raises here, which fall within the heartland of habeas jurisdiction going directly to the origins of the Great Writ.
The Court thus purges an entire class of legal challenges to executive detention from habeas review, circumscribing that foundational and "stable bulwark of our liberties," 1 W. Blackstone, Commentaries 99 (Am. ed. 1832). By self-imposing this limitation on habeas relief in the absence of a congressional suspension, the Court abdicates its constitutional duty and rejects precedent extending to the foundations of our common law.
Making matters worse, the Court holds that the Constitution's due process protections do not extend to noncitizens like respondent, who challenge the procedures used to determine whether they may seek shelter in this country or whether they may be cast to an unknown fate. The decision deprives them of any means to ensure the integrity of an expedited removal order, an order which, the Court has just held, is not subject to any meaningful judicial oversight as to its substance. In doing so, the Court upends settled constitutional law and paves the way toward transforming already summary expedited removal proceedings into arbitrary administrative adjudications.
Today's decision handcuffs the Judiciary's ability to perform its constitutional duty to safeguard individual liberty and dismantles a critical component of the separation of powers. It will leave significant exercises of executive discretion unchecked in the very circumstance where the writ's protections "have been strongest." INS v. St. Cyr , 533 U.S. 289, 301, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). And it increases the risk of erroneous immigration decisions that contravene governing statutes and treaties.
The Court appears to justify its decision by adverting to the burdens of affording robust judicial review of asylum decisions. But our constitutional protections should not hinge on the vicissitudes of the political climate or bend to accommodate burdens on the Judiciary. I respectfully dissent.
*1994 I
The as-applied challenge here largely turns on how the Court construes respondent's requests for relief. Its descriptions, as well as those of one of the concurrences, skew the essence of these claims. A proper reframing thus is in order.
A
Respondent first advances a straightforward legal question that courts have heard in habeas corpus proceedings in "case after case." Id. , at 306, 121 S.Ct. 2271. His habeas petition claimed that an asylum officer and Immigration Judge "appl[ied] an incorrect legal standard" by ordering him removed despite a showing of a significant possibility of credible fear to establish "eligibility for asylum, withholding of removal, and [Convention Against Torture] claims." App. 31-32; see also 8 U.S.C. § 1225(b)(1)(B)(v) (setting standard for credible fear as "a significant possibility, taking into account the ... statements made by the alien ... and such other facts as are known to the officer, that the alien could establish eligibility for asylum"). The Government itself has characterized that claim as a challenge to the " 'application of a legal standard to factual determinations ... underlying the Executive's negative credible-fear findings.' " 917 F.3d 1097, 1117, n. 20 (CA9 2019) (case below). At bottom, respondent alleged that he was unlawfully denied admission under governing asylum statutes and regulations.
The Court disagrees, flattening respondent's claim into a mere plea "ultimately to obtain authorization to stay in this country." Ante , at 1963; see also ante , at 1969 (describing the request as a "right to enter or remain in a country"); ante , at 1969 - 1970, n. 14 (framing relief sought as "gaining a right to remain in this country"); ante , at 1971 (equating relief with "authorization ... to remain in a country other than his own"). Yet while the Court repeatedly says that respondent seeks nothing more than admission as a matter of grace, its own descriptions of respondent's habeas petition belie its assertions. See, e.g. , ante , at 1965, n. 5 ("[T]he gravamen of his petition is that [respondent] faces persecution in Sri Lanka 'because of ' his Tamil ethnicity and political opinions"); ibid. (suggesting that the same persecution inquiry governs respondent's Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment claim); ante , at 1983, n. 28 (observing that respondent's habeas petition contains factual allegations that resemble documented persecution on the basis of ethnicity or political opinion). Though the Court refuses to admit as much, its descriptions of respondent's arguments illustrate, at bottom, claims that immigration officials legally erred in their review of his asylum application.
In papering over the true nature of respondent's claims, the Court transforms his assertions of legal error in the exercise of executive discretion into a naked demand for executive action. But the distinction between those forms of relief makes all the difference. The law has long permitted habeas petitioners to challenge the legality of the exercise of executive power, even if the executive action ultimately sought is discretionary. See St. Cyr , 533 U.S. at 307, 121 S.Ct. 2271 (citing cases). That principle has even more force today, where an entire scheme of statutes and regulations cabins the Executive's discretion in evaluating asylum applications. For that reason, the Court's observation that the ultimate "grant of asylum is discretionary" is beside the point. Ante , at 1965, n. 4.
For its part, one concurring opinion seems to acknowledge that claims that assert something other than pure factual error may constitutionally require some judicial review. Ante , at 1989 - 1991
(BREYER, J., concurring in judgment). It simply determines that respondent's credible-fear claims amount to nothing more than a "disagreement with immigration officials' findings about the two brute facts underlying their credible-fear determination," namely, the identity of his attackers and their motivations. Ante , at 1965. It also faults respondent for failing to develop his claims of legal error with citations "indicating that immigration officials misidentified or misunderstood the proper legal standard" or that they "disregarded" or were not properly trained in identifying relevant country conditions. Ante, at 1965 - 1966.
But the essence of respondent's petition is that the facts as presented (that he, a Tamil minority in Sri Lanka, was abducted by unidentified men in a van and severely beaten), when considered in light of known country conditions (as required by statute), amount at least to a "significant possibility" that he could show a well-founded fear of persecution. So viewed, respondent's challenge does not quibble with historic facts, but rather claims that those "settled facts satisfy a legal standard," which this Court has held amounts to a "legal inquiry." Guerrero-Lasprilla v. Barr , 589 U. S. ----, ----, 140 S.Ct. 1062, 1068-1069, 206 L.Ed.2d 271 (2020). The concurring opinion suggests that any conclusions drawn from the discrete settled facts here could not be "so egregiously wrong" as to amount to legal error. Ante, at 1965 - 1966. But the ultimate inquiry is simply whether the facts presented satisfy a statutory standard. While this concurring opinion may believe that the facts presented here do not show that respondent is entitled to relief, its view of the merits does not alter the legal nature of respondent's challenge.
B
Second, respondent contended that the inadequate procedures afforded to him in his removal proceedings violated constitutional due process. Among other things, he asserted that the removal proceedings by design did not provide him a meaningful opportunity to establish his claims, that the translator and asylum officer misunderstood him, and that he was not given a "reasoned explanation" for the decision. App. 27, 32; see also id. , at 32 (arguing that "[u]nder constitutionally adequate procedures, [respondent] would have prevailed on his claims"). Again, however, the Court falls short of capturing the procedural relief actually requested. The Court vaguely suggests that respondent merely wanted more cracks at obtaining review of his asylum claims, not that he wanted to challenge the existing expedited removal framework or the process actually rendered in his case as constitutionally inadequate. See ante , at 1963 (characterizing respondent as asking for "additional administrative review of his asylum claim"); see also ante , at 1965, n. 5 (describing petition as seeking "another opportunity to apply for asylum"). That misconstrues respondent's procedural challenges to the expedited removal proceedings, which matters crucially; a constitutional challenge to executive detention is just the sort of claim the common law has long recognized as cognizable in habeas. See generally Part II, infra .
One concurring opinion, meanwhile, properly characterizes respondent's claims on this score as "procedural" challenges. Ante , at 1991 - 1992 (opinion of BREYER, J.). Yet it concludes that those claims are not reviewable because they do not allege sufficiently serious defects. See ante , at 1991 - 1993 (describing cognizable claims as those involving " 'no [factual] finding[s],' " contentions that officials "skipped a layer of intra-agency review altogether," the "outright denial (or constructive denial) of a process," or an official's "fail[ure]
*1996 entirely to take obligatory procedural steps"). But these are simply distinctions of degree, not of kind. Respondent claimed that officials violated governing asylum regulations and deprived him of due process by conducting an inadequate interview and providing incomplete translation services. It is difficult to see the difference between those claims and the ones that the concurring opinion upholds as cognizable. Cf. ante , at 1992 (finding cognizable claims that an official "short-circuit[ed] altogether legally prescribed adjudication procedures by 'dictating' an immigration decision" and that an official deprived a noncitizen of " 'an opportunity to prove his right to enter the country, as the statute meant that he should have' ").
Indeed, the concurring opinion notes that the core question is whether a defect "fundamentally undermined the efficacy of process prescribed by law." Ante , at 1992. Respondent's petition plainly posits procedural defects that violate, or at least call into question, the "efficacy of process prescribed by law" and the Constitution. Ibid. The concurring opinion might think that respondent is not entitled to additional protections as a matter of law or that the facts do not show he was denied any required process. But conclusions about the merits of respondent's procedural challenges should not foreclose his ability to bring them in the first place.
C
Finally, the Court asserts that respondent did not specifically seek "release" from custody in what the Court styles as the "traditional" sense of the term as understood in habeas jurisprudence. Ante , at 1968, 1969 - 1970; cf. ante , at 1970 - 1971 (suggesting that respondent "does not claim an entitlement to release"). Instead, the Court seems to argue that respondent seeks only a peculiar form of release: admission into the United States or additional asylum procedures that would allow for admission into the United States. Such a request, the Court implies, is more akin to mandamus and injunctive relief. Ante , at 1969 - 1970.
But it is the Court's directionality requirement that bucks tradition. Respondent asks merely to be freed from wrongful executive custody. He asserts that he has a credible fear of persecution, and asylum statutes authorize him to remain in the country if he does. That request is indistinguishable from, and no less "traditional" than, those long made by noncitizens challenging restraints that prevented them from otherwise entering or remaining in a country not their own. See Part II-B-1, infra .
The Court has also never described "release" as the sole remedy of the Great Writ. Nevertheless, respondent's petition is not limited in the way the Court claims. As it acknowledges, ante , at 1968, respondent directly asked the District Court to "[i]ssue a writ of habeas corpus" without further limitation on the kind of relief that might entail, App. 33. Respondent also sought "an [o]rder directing [the Government] to show cause why the writ should not be granted" and an order "directing [the Government] to vacate the expedited removal order entered against [him]." Ibid. As the petition's plain language indicates, respondent raised a garden-variety plea for habeas relief in whatever form available and appropriate, including, but not limited to, release.
* * *
Fairly characterized, respondent's claims allege legal error (for violations of governing asylum law and for violations of procedural due process) and an open-ended request for habeas relief. It is "uncontroversial" that the writ encompasses such claims. See *1997 Boumediene v. Bush , 553 U.S. 723, 779, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (concluding that release is but one form of relief available); see also St. Cyr. , 533 U.S. at 302, 304-308, 121 S.Ct. 2271 (citing cases predating the founding to show that the writ could challenge "the erroneous application or interpretation" of relevant law); see also Part II-D, infra .
II
Only by recasting respondent's claims and precedents does the Court reach its decision on the merits. By its account, none of our governing cases, recent or centuries old, recognize that the Suspension Clause guards a habeas right to the type of release that respondent allegedly seeks.[1] Ante , at 1969 - 1970, n. 14 (finding no evidence that the writ was understood in 1789 to grant relief that would amount to "gaining a right to remain in this country"); ante , at 1969 - 1970 (characterizing a " 'meaningful opportunity' " for review of asylum claims as falling outside of traditional notions of release from custody). An overview of cases starting from the colonial period to the present reveals that the Court is incorrect, even accepting its improper framing of respondent's claims.
A
The critical inquiry, the Court contends, is whether respondent's specific requests for relief (namely, admission into the United States or additional asylum procedures allowing for admission into the United States) fall within the scope of the kind of release afforded by the writ as it existed in 1789. Ante , at 1968 - 1969, 1969; see also ante , at 1968 (criticizing the court below for holding § 1252(e)(2) unconstitutional "without citing any pre-1789 case about the scope of the writ"). This scope, it explains, is what the Suspension Clause protects "at a minimum." Ante , at 1969. But as the Court implicitly acknowledges, its inquiry is impossible. The inquiry also runs headlong into precedent, which has never demanded the kind of precise factual match with pre-1789 case law that today's Court demands.
To start, the Court recognizes the pitfalls of relying on pre-1789 cases to establish principles relevant to immigration and asylum: "At the time, England had nothing like modern immigration restrictions." Ante , at 1973 ("As late as 1816, the word 'deportation' apparently 'was not to be found in any English dictionary' "). It notes, too, that our cases have repeatedly observed the relative novelty of immigration laws in the early days of this country. Ante , at 1973 - 1974 (citing Harisiades v. Shaughnessy , 342 U.S. 580, 588, n. 15, 72 S.Ct. 512, 96 L.Ed. 586 (1952) ("An open door to the immigrant was the early federal *1998 policy"); St. Cyr , 533 U.S. at 305, 121 S.Ct. 2271 (remarking that the first immigration regulation was enacted in 1875)); see also Demore v. Kim , 538 U.S. 510, 539, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003) (O'Connor, J., concurring in part and concurring in judgment) ("Because colonial America imposed few restrictions on immigration, there is little case law prior to that time about the availability of habeas review to challenge temporary detention pending exclusion or deportation").
The Court nevertheless seems to require respondent to engage in an exercise in futility. It demands that respondent unearth cases predating comprehensive federal immigration regulation showing that noncitizens obtained release from federal custody onto national soil. But no federal statutes at that time spoke to the permissibility of their entry in the first instance; the United States lacked a comprehensive asylum regime until the latter half of the 20th century. Despite the limitations inherent in this exercise, the Court appears to insist on a wealth of cases mirroring the precise relief requested at a granular level; nothing short of that, in the Court's view, would demonstrate that a noncitizen in respondent's position is entitled to the writ. See ante , at 1972, n. 18 (dismissing respondent's cited cases on the ground that "[w]hether the founding generation understood habeas relief more broadly than described by Blackstone, Justice Story, and our prior cases ... cannot be settled by a single case or even a few obscure and possibly aberrant cases"); see also Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961 (1998) (noting the inherent difficulties of a strict originalist approach in the habeas context because of, among other things, the dearth of reasoned habeas decisions at the founding).
But this Court has never rigidly demanded a one-to-one match between a habeas petition and a common-law habeas analog. In St. Cyr , for example, the Court considered whether a noncitizen with a controlled substance conviction could challenge on habeas the denial of a discretionary waiver of his deportation order. 533 U.S. at 293, 121 S.Ct. 2271. In doing so, the Court did not search high and low for founding-era parallels to waivers of deportation for criminal noncitizens. It simply asked, at a far more general level, whether habeas jurisdiction was historically "invoked on behalf of noncitizens ... in the immigration context" to "challenge Executive ... detention in civil cases." Id. , at 302, 305, 121 S.Ct. 2271. That included determining whether "[h]abeas courts ... answered questions of law that arose in the context of discretionary relief " (including questions regarding the allegedly "erroneous application or interpretation of statutes"). Id. , at 302, and n. 18, 307, 121 S.Ct. 2271.
Boumediene is even clearer that the Suspension Clause inquiry does not require a close (much less precise) factual match with historical habeas precedent. There, the Court concluded that the writ applied to noncitizen detainees held in Guantanamo, 553 U.S. at 771, 128 S.Ct. 2229, despite frankly admitting that a "[d]iligent search by all parties reveal[ed] no certain conclusions" about the relevant scope of the common-law writ in 1789, id. , at 746, 128 S.Ct. 2229. Indeed, the Court reasoned that none of the cited cases illustrated whether a "common-law court would or would not have granted ... a petition for a writ of habeas corpus" like that brought by the noncitizen-detainee petitioners, and candidly acknowledged that "the common-law courts simply may not have confronted cases with close parallels." Id. , at 746, 752, 128 S.Ct. 2229. But crucially, the Court declined to "infer too *1999 much, one way or the other, from the lack of historical evidence on point." Id. , at 752, 128 S.Ct. 2229. Instead, it sought to find comparable common-law habeas cases by "analogy." Id. , at 748-752, 128 S.Ct. 2229.
There is no squaring the Court's methodology today with St. Cyr or Boumediene. As those cases show, requiring near-complete equivalence between common-law habeas cases and respondent's habeas claim is out of step with this Court's longstanding approach in immigration cases.
B
1
Applying the correct (and commonsense) approach to defining the Great Writ's historic scope reveals that respondent's claims have long been recognized in habeas.
Respondent cites Somerset v. Stewart , Lofft. 1, 98 Eng. Rep. 499 (K. B. 1772), as an example on point. There, Lord Mansfield issued a writ ordering release of a slave bound for Jamaica, holding that there was no basis in English law for "sending ... him over" to another country. Id. , at 17-19, 98 Eng. Rep., at 509-510. Thus, the writ issued even though it "did not free [the] slave so much as it protected him from deportation." P. Halliday, Habeas Corpus: From England to Empire 175 (2010). Somerset establishes the longstanding availability of the writ to challenge the legality of removal and to secure release into a country in which a petitioner sought shelter. Scholarly discussions of Murray's Case suggest much of the same. There, the King's Bench granted habeas to allow a nonnative to remain in England and to prevent his removal to Scotland for trial. Halliday, Habeas Corpus, at 236.
The Court dismisses these examples outright. It acknowledges that the petitioner in Somerset may have been allowed to remain in England because of his release on habeas, yet declares that this was "due not to the wri[t] ordering [his] release" but rather to the existing state of the law. Ante , at 1973 - 1974. But the writ clearly did more than permit the petitioner to disembark from a vessel; it prevented him from being "sen[t] ... over" to Jamaica. Lofft., at 17, 98 Eng. Rep., at 509. What England's immigration laws might have prescribed after the writ's issuance did not bear on the availability of the writ as a means to remain in the country in the first instance.
The Court also casts aside the facts of Murray's Case , even though they, too, reveal that habeas was used to permit a nonnative detainee to remain in a country. Ante , at 1972 - 1973, n. 18. The Court minimizes the decision as "obscure and possibly aberrant." Ibid . But given the relative paucity of habeas cases from this era, it is telling that the case serves as another example of the writ being used to allow a noncitizen to remain in England.[2]
The reasoning of Somerset and Murray's Case carried over to the Colonies, where colonial governments presumed habeas available to noncitizens to secure their residence in a territory. See generally Oldham & Wishnie, The Historical Scope of Habeas Corpus and INS v. St. Cyr , 16 Geo. Immigration L. J. 485 (2002).
*2000 For example, in 1755, British authorities sought to deport French Acadian settlers from Nova Scotia, then under the control of Great Britain, to the American Colonies. Id. , at 497. The Governor and Assembly of South Carolina resisted the migrants' arrival and detained them in ships off the coast of Charleston. They recognized, however, that the exclusion could not persist because the migrants would be entitled to avail themselves of habeas corpus. Id. , at 498. Ultimately, the Governor released most of the Acadian migrants for resettlement throughout the Colony. Ibid.
Founding era courts accepted this view of the writ's scope. Rather than credit these decisions, the Court marches through an assorted selection of cases and throws up its hands, contending that the case law merely reflects a wide range of circumstances for which individuals were deprived of their liberty. See ante , at 1971 - 1972. Thus, the Court concludes, the common law simply did not speak to whether individuals could seek "release" that would allow them to enter a country (as opposed to being expelled from it).
At the same time, notwithstanding its professed keen interest in precedent, the Court seems to discount decisions supporting respondent's view that habeas permitted release from custody into the country. At least two other classes of cases demonstrate that the writ was available from around the founding onward to noncitizens who were detained, and wanted to remain, including those who were prevented from entering the United States at all.
First, common-law courts historically granted the writ to discharge deserting foreign sailors found and imprisoned in the United States. In Commonwealth v. Holloway , 1 Serg.&Rawle 392 (1815), the Pennsylvania Supreme Court granted a writ of habeas corpus to a Danish sailor who had deserted his vessel in violation of both an employment contract and Danish law. The court explained that the desertion did not violate any domestic law or treaty, and thus imprisonment was inappropriate. Id. , at 396 (opinion of Tilghman, C. J.). By ordering an unconditional discharge and declining to return the noncitizen sailor to the custody of any foreign power, the court used the writ to order a release that authorized a noncitizen to remain in the United States, a country "other than his own." Ante , at 1971. The same was true in similar cases that even the Court cites. See ante , at 1973 (citing Case of the Deserters from the British Frigate L'Africaine , 3 Am. L. J. & Misc. Repertory 132 (Md. 1810) (reporting on a decision discharging deserters); Case of Hippolyte Dumas , 2 Am. L. J. & Misc. Repertory 86 (Pa. 1809) (same)).
Curiously, the Court does not contest that the writs in these cases were used to secure the liberty of foreign sailors, and consequently their right to enter the country.[3] Rather, it remarks that judges at the time "chafed at having to order even release," ante , at 1973, which some saw as inconsistent with principles of comity, Holloway , 1 Serg.&Rawle at 394. But reluctance is not inability. That those judges followed the law's dictates despite their distaste for the result should give today's Court pause.
The Court seizes on one case where a court ordered a deserting sailor to be returned to his foreign vessel-master. See ante , at 1970 - 1971, 1973 (citing Ex parte D'Olivera , 7 F.Cas. 853, 854 (No. 3,967) (CCD Mass. 1813) ). But it reads too much *2001 into this one decision. In D'Olivera , the court held that deserting sailors were unlawfully confined and granted a writ of habeas corpus, but directed that they be discharged to their vessel-master out of "a desire not to encourage desertion among foreign seamen." Id. , at 854. As illustrated by other deserter cases supra, the kind of results-oriented decisionmaking in D'Olivera does not seem to be the norm. The Court's proclamation about how the scope of common-law habeas cannot hinge on a "single case" should have equal force here. Ante , at 1972 - 1973 n. 18.
Next, courts routinely granted the writ to release wrongfully detained noncitizens into Territories other than the detainees' "own." Many involved the release of fugitive or former slaves outside their home State. In these cases, courts decided legal questions as to the status of these petitioners. In Arabas v. Ivers , 1 Root 92 (Conn. Super. Ct. 1784), for example, a Connecticut court determined that a former slave from New York held in local jail on his alleged master's instructions had, in fact, been freed through his service in the Continental Army. The court ordered him discharged "upon the ground that he was a freeman, absolutely manumitted from his master by enlisting and serving in the army." Id. , at 93. See also In re Belt , 7 N.Y.Leg.Obs. 80 (1848) (granting habeas to discharge an imprisoned fugitive slave whose owner did not timely apply for his return to Maryland); In re Ralph , 1 Morris 1 (Iowa 1839) (discharging person from custody on the grounds that he was not a fugitive slave subject to return to Missouri when he had been allowed to travel to the Iowa Territory by his former master); Commonwealth v. Holloway , 2 Serg.&Rawle 305 (Pa. 1816) (holding on habeas corpus that a child born in a free State to a slave was free); In re Richardson's Case , 20 F.Cas. 703, (No. 11778) (CC DC 1837) (ordering prisoner to be discharged in the District of Columbia because warrant was insufficient to establish that he was a runaway slave from Maryland); Commonwealth v. Griffith , 19 Mass. 11 (1823) (contemplating that the status of a freeman seized in Massachusetts as an alleged fugitive from Virginia could be determined on habeas corpus).
The weight of historical evidence demonstrates that common-law courts at and near the founding granted habeas to noncitizen detainees to enter Territories not considered their own, and thus ordered the kind of release that the Court claims falls outside the purview of the common-law writ.
The Court argues that none of this evidence is persuasive because the writ could not be used to compel authorization to enter the United States. Ante , at 1973 - 1974. But that analogy is inapt. Perhaps if respondent here sought to use the writ to grant naturalization, the comparison would be closer. But respondent sought only the proper interpretation and application of asylum law (which statutorily permits him to remain if he shows a credible fear of persecution), or in the alternative, release pursuant to the writ (despite being cognizant that he could be denied asylum or rearrested upon release if he were found within the country without legal authorization). But that consequence does not deprive respondent of the ability to invoke the writ in the first instance. See, e.g. , Lewis v. Fullerton , 22 Va. 15 (1821) (affirming that a judgment on habeas corpus in favor of a slave was not conclusive of her rights but merely permitted release from custody on the record before the court and did not prohibit recapture by a master); Ralph , 1 Morris, at 1 (noting that an adjudication that petitioner was not a fugitive only exempted him from fugitive-slave laws but did not prohibit master *2002 from entering Territory to reclaim him on his own accord).
For these reasons, the Court is wrong to dispute that common-law habeas practice encompassed the kind of release respondent seeks here.
2
The Court also appears to contend that respondent sought merely additional procedures in his habeas adjudication and that this kind of relief does not fall within the traditional scope of the writ. That reflects a misunderstanding of the writ. Habeas courts regularly afforded the state additional opportunities to show that a detention was lawful before ordering what the Court now considers a release outright.
The common-law writ of habeas corpus ad subjiciendum evolved into what we know and hail as the "Great Writ." See 3 W. Blackstone, Commentaries on the Laws of England 131 (1768). That writ, at bottom, allowed a court to elicit the cause for an individual's imprisonment and to ensure that he be released, granted bail, or promptly tried. See Oaks, Habeas Corpus in the States-1776-1865, 32 U. Chi. L. Rev. 243, 244 (1965). From its origins, the writ did not require immediate release, but contained procedures that would allow the state to proceed against a detainee. Under the English Habeas Corpus Act of 1679, jailers were ordered to make a "return" to a writ within a designated time period and certify the true causes of imprisonment. Id ., at 252-253. Justices of the King's Bench obtained returns that provided full legal accounts justifying detention. Halliday & White, The Suspension Clause: English Text, Imperial Contexts, and American Implications, 94 Va. L. Rev. 575, 599-600 (2008) (Halliday & White). They also examined and were guided by depositions upon which a detention was founded to determine whether to admit a petitioner to bail. Oaks, 32 U. Chi. L. Rev., at 258. Indeed, the King's Bench routinely considered facts not asserted in the return to assist scrutiny of detentions. Halliday & White 610; see also id. , at 611 (documenting instances where the court would consider affidavits of testimony beyond what was included in the return).
Moreover, early practice showed that common-law habeas courts routinely held proceedings to determine whether detainees should be discharged immediately or whether the state could subject them to further proceedings, including trial in compliance with proper procedures. See Ex parte Bollman , 4 Cranch 75, 125, 8 U.S. 75, 2 L.Ed. 554 (1807) (taking testimony in conjunction with an "inquiry" to determine whether "the accused shall be discharged or held to trial"). In Ex parte Kaine , 14 F.Cas. 78 (No. 7,597) (CC SDNY 1853), for example, a federal court analyzed whether a petitioner, who had been found guilty of an offense by a commissioner, was subject to extradition. The court passed on questions of law concerning whether the commissioner had the power to adjudicate petitioner's criminality. Id. , at 80. Ultimately, the court found that petitioner was "entitled to be discharged from imprisonment" due to defects in the proceedings before the commissioner, but entertained further evidence on whether he could nevertheless be extradited. Id. , at 82. Only after finding no additional evidence that would permit extradition did the court order release. Ibid.
Similarly, in Coleman v. Tennessee , 97 U.S. 509, 24 L.Ed. 1118 (1879), the petitioner had been convicted of a capital offense by a state court, even though he had committed the offense while a soldier in the United States Army. Id. , at 510-511. This Court granted habeas on the grounds that the state-court judgment was void but, because the petitioner had also been *2003 found guilty of murder by a military court, nevertheless turned the prisoner over to the custody of the military for appropriate punishment. Id. , at 518-520. Not surprisingly, then, the Court has found that habeas courts may discharge detainees in a manner that would allow defects in a proceeding below to be corrected. In re Bonner , 151 U.S. 242, 261, 14 S.Ct. 323, 38 L.Ed. 149 (1894).
These examples confirm that outright habeas release was not always immediately awarded. But they also show that common-law courts understood that relief short of release, such as ordering officials to comply with the law and to correct underlying errors, nevertheless fell within the scope of a request for habeas corpus.[4]
3
Despite exalting the value of pre-1789 precedent, the Court's key rationale for why respondent does not seek "release" in the so-called traditional sense rests on an inapposite, contemporary case: Munaf v. Geren , 553 U.S. 674, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008).[5] Ante , at 1970 - 1971. Munaf , the Court claims, shows that habeas is not available to seek an order to be brought into this country. Ante , at 1970 - 1971. But that case is in a category of its own and has no bearing on respondent's claims here. Munaf addressed a one-of-a-kind scenario involving the transfer of individuals between different sovereigns. There, two United States citizens in Iraq filed habeas petitions seeking to block their transfer to Iraqi authorities after being accused of committing crimes and detained by American-led coalition forces pending investigation and prosecution in Iraqi courts. 553 U.S. at 679-680, 692, 128 S.Ct. 2207. The central question, this Court repeatedly stated, was "whether United States district courts may exercise their habeas jurisdiction to enjoin our Armed Forces from transferring individuals detained within another sovereign's territory to that sovereign's government for criminal prosecution." Id. , at 689, 128 S.Ct. 2207 ; see also id. , at 704, 128 S.Ct. 2207.
In concluding that habeas did not extend to the relief sought by the citizens detained in Iraq, the Munaf Court relied on cases involving habeas petitions filed to avoid extradition. Id. , at 695-696, 128 S.Ct. 2207 (citing Wilson v. Girard , 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957) (per curiam ), and Neely v. Henkel , 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901) ). These decisions, the Court concluded, established that American courts lack habeas jurisdiction to enjoin an extradition or similar transfer to a foreign sovereign exercising a right to prosecution. 553 U.S. at 696-697, 128 S.Ct. 2207. These circumstances, which today's Court overlooks, mean that Munaf is more like the extradition cases that the Court deems not *2004 "pertinent." Ante, at 1973 - 1974.[6]
In any event, respondent is not similarly situated to the petitioners in Munaf , who sought habeas to thwart removal from the United States in the face of a competing sovereign's interests. Mindful that the case implicated "sensitive foreign policy issues in the context of ongoing military operations," the Munaf Court observed that granting habeas relief would "interfere with Iraq's sovereign right to punish offenses against its laws committed within its borders." 553 U.S. at 692, 128 S.Ct. 2207 (internal quotation marks omitted); see also id. , at 689, 694, 700, 128 S.Ct. 2207. For that reason, it proceeded " 'with the circumspection appropriate when this Court is adjudicating issues inevitably entangled in the conduct of ... international relations.' " Id. , at 689, 692, 128 S.Ct. 2207. Here, of course, no foreign sovereign is exercising a similar claim to custody over respondent during an ongoing conflict that would trigger the comity concerns that animated Munaf .
C
Next, the Court casually dismisses nearly 70 years of precedent from the finality era, the most relevant historic period for examining judicial review of immigration decisions. It concludes that, in case after case, this Court exercised habeas review over legal questions arising in immigration cases akin to those at issue here, not because the Constitution required it but only because a statute permitted it. Ante , at 1975 - 1976. That conclusion is both wrong in its own right and repeats arguments this Court rejected a half century ago when reviewing this same body of cases.
At the turn of the 20th century, immigration to the United States was relatively unrestricted. Public sentiment, however, grew hostile toward many recent entrants, particularly migrant laborers from China. In response, Congress enacted the so-called Chinese Exclusion Act of 1882, ch. 126, 22 Stat. 58, which prohibited the entry *2005 of Chinese laborers to the United States. The Scott Act, ch. 1064, 25 Stat. 504, enacted in 1888, forbade reentry of Chinese laborers who had left after previously residing in this country. Although immigration officials routinely denied entry to arriving migrants on the basis of these laws, many of these decisions were overturned by federal courts on habeas review. See, e.g. , United States v. Jung Ah Lung , 124 U.S. 621, 8 S.Ct. 663, 31 L.Ed. 591 (1888).
This did not escape Congress' attention. See Select Committee on Immigration & Naturalization, H. R. Rep. No. 4048, 51st Cong., 2d Sess., 273-275 (1891) (documenting rate of reversal of immigration exclusion orders by Federal District Court in San Francisco). Congress responded by enacting the Immigration Act of 1891, which stripped federal courts of their power to review immigration denials: "All decisions made by the inspection officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary of the Treasury." Act of Mar. 3, 1891, § 8, 26 Stat. 1085. By its terms, that restriction on federal judicial power was not limited to review of some undefined subset of issues, such as questions of law or fact; it made executive immigration decisions final in all respects.
The Court, however, quickly construed the statute in Nishimura Ekiu v. United States , 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146 (1892) ( Ekiu ), to preclude only review of executive factfinding. Having so construed the statute, the Court in Ekiu , and in case after case following Ekiu , recognized the availability of habeas to review a range of legal and constitutional questions arising in immigration decisions. The crucial question here is whether the finality-era Courts adopted that construction of jurisdiction-stripping statutes because it was simply the correct interpretation of the statute's terms and nothing more or because that construction was constitutionally compelled to ensure the availability of habeas review. The better view is that Ekiu 's construction of the 1891 statute was constitutionally compelled.
In Ekiu , the Court recognized that a Japanese national was entitled to seek a writ of habeas corpus to review an exclusion decision issued almost immediately upon her arrival to the United States. As the Court notes, ante , at 1977, the relevant issue in that case was whether the 1891 Act, "if construed as vesting ... exclusive authority" in the Executive to determine a noncitizen's right to enter the United States, violated petitioner's constitutional "right to the writ of habeas corpus , which carried with it the right to a determination by the court as to the legality of her detention," 142 U.S. at 656, 12 S.Ct. 336 (statement of the case). That is, the Ekiu Court confronted whether construing the 1891 Act as precluding all judicial review of immigration decisions like the exclusion order at issue would violate the constitutional guarantee to habeas.
The Court answered that question by construing the 1891 Act as precluding judicial review only of questions of fact. "An alien immigrant," the Court first held, who is "prevented from landing [in the United States] by any [executive] officer ... and thereby restrained of his liberty, is doubtless entitled to a writ of habeas corpus to ascertain whether the restraint is lawful." Id ., at 660, 12 S.Ct. 336. The Court then explained that it had authority to hear the case (despite Congress' clear elimination of judicial review) because it interpreted the 1891 Act as meaning only that an immigration official's determination of "facts" was final and unreviewable. Ibid. (explaining *2006 that Congress could entrust the final determination of facts to executive officers).
After so articulating the 1891 Act's limits on judicial review, the Court analyzed two challenges to the integrity of the proceedings, neither of which raised questions of historical fact. See id. , at 662-663, 12 S.Ct. 336 (considering whether immigration officer's appointment was unconstitutional such that his actions were invalid); id. , at 663, 12 S.Ct. 336 (determining whether proceedings were unlawful because the officer failed to take sworn testimony or make a record of the decision).[7] Although the Court ultimately concluded that those legal and constitutional challenges lacked merit, id. , at 662-664, 12 S.Ct. 336, what matters is that the Court evaluated the arguments and recognized them as possible grounds for habeas relief.
What, then, can Ekiu tell us? Today's Court finds significant that the brief opinion makes no explicit mention of the Suspension Clause. Ante , at 1978. This omission, it concludes, can only mean that the Ekiu Court did not think that (or had no occasion to consider whether) the Suspension Clause "imposed any limitations on the authority of Congress to restrict the issuance of writs of habeas corpus in immigration matters." Ante , at 1977. According to this theory, Ekiu concluded that the plain terms of the 1891 Act prohibited judicial review of executive factfinding alone, and nothing more can be said.
But this myopic interpretation ignores many salient facts. To start, the 1891 Act was enacted for the purpose of limiting all judicial review of immigration decisions, not just a subset of factual issues that may arise in those decisions. Further, the plain terms of the statute did not cabin the limitation on judicial review to historical facts found by an immigration officer. Ekiu , moreover, evaluated the Act's constitutionality in view of the petitioner's argument that the limitation on judicial review violated the constitutional "right to the writ of habeas corpus ." 142 U.S. at 656, 12 S.Ct. 336 (statement of the case). These considerations all point in one direction: Even if the Ekiu Court did not explicitly hold that the Suspension Clause prohibits Congress from broadly limiting all judicial review in immigration proceedings, it certainly decided the case in a manner that avoided raising this constitutional question. Indeed, faced with a jurisdiction-stripping statute, the only review left for the Ekiu Court was that required by the Constitution and, by extension, protected by the guarantee of habeas corpus.
The Court also maintains that Ekiu concluded that " 'the act of 1891 is constitutional' " in full, not "only in part." Ante , at 1977 - 1978 (quoting Ekiu , 142 U.S. at 664, 12 S.Ct. 336 ). Yet as the Court acknowledges, it was only "after interpreting the 1891 Act" as precluding judicial review of questions of fact alone that the Ekiu Court deemed it constitutional. Ante , at 1977; see also Ekiu , 142 U.S. at 664, 12 S.Ct. 336 (concluding that "[t]he result" of its construction is that the 1891 Act "is constitutional"). That cannot mean that Ekiu found the 1891 Act constitutional even to the extent that it prevented all judicial review of immigration decisions, even those brought on habeas. What it can only mean, instead, is that Ekiu 's construction of the 1891 Act was an answer to the constitutional question posed by the case: whether and to what extent denying judicial review under the 1891 Act would violate the constitutional "right to the writ of *2007 habeas corpus ." 142 U.S. at 656, 12 S.Ct. 336 (statement of the case).[8]
Bolstering this interpretation is that the Court has repeatedly reached the same result when interpreting subsequent statutes purporting to strip federal courts of all jurisdiction over immigration decisions. In Gegiow v. Uhl , 239 U.S. 3, 36 S.Ct. 2, 60 L.Ed. 114 (1915), for example, the Court observed that Ekiu decided that "[t]he conclusiveness of the decisions of immigration officers under [the 1891 Act]" referred only to "conclusiveness upon matters of fact." 239 U.S. at 9, 36 S.Ct. 2. It relied heavily on Ekiu to support its determination that the Immigration Act of 1907, 34 Stat. 898, which also rendered decisions of immigration officers to be "final," § 25, id. , at 907, similarly only barred judicial review of questions of fact, 239 U.S. at 9, 36 S.Ct. 2. Indeed, time and again, against a backdrop of statutes purporting to bar all judicial review of executive immigration decisions, this Court has entertained habeas petitions raising a host of issues other than historic facts found by immigration authorities.[9]
To be sure, this entrenched line of cases does not directly state that habeas review of immigration decisions is constitutionally compelled. But an alternate understanding of those cases rests on an assumption that is farfetched at best: that, year after year, and in case after case, this Court simply ignored the unambiguous texts of the serial Immigration Acts limiting judicial review altogether. The Court's pattern of hearing habeas cases despite those statutes' contrary mandate reflects that the Court understood habeas review in those cases as not statutorily permitted but constitutionally compelled.
In any event, we need not speculate now about whether the Ekiu Court, or the Courts that followed, had the constitutional right to habeas corpus in mind when they interpreted jurisdiction-stripping statutes only to preclude review of historic facts. This Court has already identified which view is correct. In Heikkila v. Barber , 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972 (1953), the Court explained that Ekiu *2008 and its progeny had, in fact, construed the finality statutes to avoid serious constitutional questions about Congress' ability to strip federal courts of their habeas power. As Heikkila reiterated, the key question in Ekiu (and in later cases analyzing finality statutes) was the extent to which the Constitution allowed Congress to make administrative decisions unreviewable. 345 U.S. at 234, 73 S.Ct. 603. And it concluded that the jurisdiction-stripping immigration statute in that case, a successor to the 1891 Act, "preclud[ed] judicial intervention in deportation cases except insofar as it was required by the Constitution." Id. , at 234-235, 73 S.Ct. 603.
Heikkila thus settles the matter; during the finality era, this Court either believed that the Constitution required judicial review on habeas of constitutional and legal questions arising in immigration decisions or, at the very least, thought that there was a serious question about whether the Constitution so required. Although the Court tries to minimize that conclusion as not dispositive of the question presented, ante, at 29, such a conclusion undoubtedly weighs against finding § 1252(e)(2) constitutional in spite of its broad prohibition on reviewing constitutional and legal questions.
The Court dismisses Heikkila and its explanation of the finality-era cases outright. It fixates on the fact that Heikkila was not itself a habeas case and instead analyzed whether judicial review of immigration orders was available under the Administrative Procedure Act (APA). Ante , at 1980 - 1981. Heikkila 's discussion of the APA does not detract from its affirmation that when the language of a jurisdiction-stripping statute precludes all judicial review, the only review that is left is that required by the constitutional guarantee of habeas corpus. 345 U.S. at 235, 73 S.Ct. 603.[10] Most importantly, Heikkila concluded that APA review was not equivalent to that judicial review. Second, the Court also states that Heikkila never interpreted Ekiu as having found the 1891 Act "partly unconstitutional." Ante , at 1980 - 1981. But there was no need for the Ekiu Court to find the 1891 Act unconstitutional in part to construe it as prohibiting only review of historic facts. Instead, as Heikkila explained, Ekiu reached its decision by exercising constitutional avoidance.
By disregarding Heikkila , the Court ignores principles of stare decisis to stir up a settled debate. Cf. Ramos v. Louisiana , 590 U. S. ----, ----, ----, 140 S.Ct. 1390, 1425, 1431-1432, 206 L.Ed.2d 583 (2020) (ALITO, J., dissenting). Perhaps its view is tinted by the fact that it doubts the Suspension Clause could limit Congress' ability to eliminate habeas jurisdiction at all. The Court scoffs at the notion that a limitation on judicial review would have been understood as an unconstitutional suspension of habeas, noting and distinguishing the limited number of occasions that this Court has found a suspension of the writ of habeas corpus. See ante , at 1978 - 1979; but see ante , at 1966 - 1967, n. 4 (THOMAS, J., concurring) (noting that historically, suspensions of habeas did not *2009 necessarily mention the availability of the writ). The references to those major historic moments where this Court has identified a suspension only establish the outer bounds of Congress' suspension powers; it says nothing about whether, and to what extent, more limited restrictions on judicial review might also be found unconstitutional.
Indeed, the Court acknowledges that some thought it an open question during the finality era whether the Suspension Clause imposes limits on Congress' ability to limit judicial review. See ante , at 1980, n. 25 (quoting Justice Brewer's concurring opinion in United States ex rel. Turner v. Williams , 194 U.S. 279, 295, 24 S.Ct. 719, 48 L.Ed. 979 (1904), raising the question). That this question remained unsettled, see n. 1, supra , suffices to support the Court's conclusion in Heikkila : The finality-era Courts endeavored to construe jurisdiction-stripping statutes to avoid serious constitutional questions about the extent of congressional power to limit judicial review.
At bottom, the better view of the finality-era cases is that they understood the habeas right they sustained to be, or at least likely to be, constitutionally compelled. Certainly the cases do not establish the Court's simplistic view to the contrary: That the finality-era Court entertained habeas petitions only because no statute limited its ability to do so, and no Constitutional provision required otherwise. That reading of precedent disregards significant indications that this Court persistently construed immigration statutes stripping courts of judicial review to avoid depriving noncitizens of constitutional habeas guarantees. Ignoring how past courts wrestled with this issue may make it easier for the Court to announce that there is no unconstitutional suspension today. But by sweeping aside most of our immigration history in service of its conclusion, the Court reopens a question that this Court put to rest decades ago, and now decides it differently. The cost of doing so is enormous. The Court, on its own volition, limits a constitutional protection so respected by our Founding Fathers that they forbade its suspension except in the direst of circumstances.
D
Not only does the Court cast to one side our finality-era jurisprudence, it skims over recent habeas precedent. Perhaps that is because these cases undermine today's decision. Indeed, both INS v. St. Cyr , 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), and Boumediene v. Bush , 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), instruct that eliminating judicial review of legal and constitutional questions associated with executive detention, like the expedited-removal statute at issue here does, is unconstitutional.
The Court acknowledges St. Cyr 's holding but does not heed it. St. Cyr concluded that " '[b]ecause of [the Suspension] Clause some "judicial intervention in deportation cases" is unquestionably "required by the Constitution." ' " Ante , at 1981 (quoting 533 U.S. at 300, 121 S.Ct. 2271 ). This statement affirms what the finality-era cases long suggested: that the Suspension Clause limits Congress' power to restrict judicial review in immigration cases. Nor did St. Cyr arrive at this conclusion simply based on canons of statutory construction. The Court spoke of deeper historical principles, affirming repeatedly that "[a]t its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." Id. , at 301, 121 S.Ct. 2271 ; see also id. , at 305, 121 S.Ct. 2271 ("The writ of habeas corpus has *2010 always been available to review the legality of Executive detention"). The Court looked to founding era cases to establish that the scope of this guarantee extended to both the "interpretation" and "application" of governing law, including law that guided the exercise of executive discretion. Id. , at 302, 121 S.Ct. 2271.
Based on that history, the Court also concluded that "a serious Suspension Clause issue would be presented" by precluding habeas review in the removal context, id. , at 305, 121 S.Ct. 2271, even where there was "no dispute" that the Government had the legal authority to detain a noncitizen like St. Cyr, id. , at 303, 121 S.Ct. 2271. Thus based on the same principles that the Court purports to apply in this case, the St. Cyr Court reached the opposite conclusion: The Suspension Clause likely prevents Congress from eliminating judicial review of discretionary executive action in the deportation context, even when the writ is used to challenge more than the fact of detention itself.
Boumediene reprised many of the rules articulated in St. Cyr . It first confirmed that the Suspension Clause applied to detainees held at Guantanamo Bay, repeating the "uncontroversial" proposition that "the privilege of habeas corpus entitles" an executive detainee to a "meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." 553 U.S. at 779, 128 S.Ct. 2229 (quoting St. Cyr , 533 U.S. at 302, 121 S.Ct. 2271 ). Then the Court detailed the writ's remedial scope. It affirmed that one of the "easily identified attributes of any constitutionally adequate habeas corpus proceeding" is that "the habeas court must have the power to order the conditional release of an individual unlawfully detained." 553 U.S. at 779, 128 S.Ct. 2229. Notably, the Court explained that release "need not be the exclusive remedy," reasoning that "common-law habeas corpus was, above all, an adaptable remedy" whose "precise application and scope changed depending upon the circumstances." Ibid. (citing 3 W. Blackstone, Commentaries *131). The Court noted that any habeas remedy might be tempered based on the traditional test for procedural adequacy in the due process context and thus could accommodate the "rigor of any earlier proceedings." 553 U.S. at 781, 128 S.Ct. 2229 (citing Mathews v. Eldridge , 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ).
The Court discounts these cases because it objects to the perceived direction of respondent's requested release. Ante , at 1980 - 1981 (explaining that Boumediene did not suggest that the enemy combatant petitioners were entitled to enter the United States upon release). It similarly contends that respondent's attempted use of the writ is "very different" from that at issue in St. Cyr. Ante , at 1981.
Neither rejoinder is sound. St. Cyr and Boumediene confirm that at minimum, the historic scope of the habeas power guaranteed judicial review of constitutional and legal challenges to executive action. They do not require release as an exclusive remedy, let alone a particular direction of release. Rather, both cases built on the legacy of the finality era where the Court, concerned about the constitutionality of limiting judicial review, unquestionably entertained habeas petitions from arriving migrants who raised the same types of questions respondent poses here. See, e.g., St. Cyr , 533 U.S. at 307, 121 S.Ct. 2271 (citing United States ex rel. Accardi v. Shaughnessy , 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) (habeas case attacking the denial of an application for suspension of deportation); see also id. , at 268, 74 S.Ct. 499 ("[W]e object to the Board's alleged failure to exercise its own discretion, *2011 contrary to existing valid regulations" (emphasis deleted))).
As discussed above, respondent requests review of immigration officials' allegedly unlawful interpretation of governing asylum law, and seeks to test the constitutional adequacy of expedited removal procedures. As a remedy, he requests procedures affording a conditional release, but certainly did not so limit his prayer for relief. His constitutional and legal challenges fall within the heartland of what St. Cyr said the common-law writ encompassed, and Boumediene confirms he is entitled to additional procedures as a form of conditional habeas relief. These precedents themselves resolve this case.
* * *
The Court wrongly declares that § 1252(e)(2) can preclude habeas review of respondent's constitutional and legal challenges to his asylum proceedings. So too the Court errs in concluding that Congress need not provide a substitute mechanism to supply that review. In so holding, the Court manages to flout precedents governing habeas jurisprudence from three separate eras. Each one shows that respondent is entitled to judicial review of his constitutional and legal claims. Because § 1252(e)(2) excludes his challenges from habeas proceedings, and because the INA does not otherwise provide for meaningful judicial review of the Executive's removal determination, respondent has no effective means of vindicating his right to habeas relief. Quite simply, the Constitution requires more.
III
Although the Court concludes that habeas relief is not available because of the particular kind of release that it thinks respondent requests, it also suggests that respondent's unlawful status independently prohibits him from challenging the constitutionality of the expedited removal proceedings. By determining that respondent, a recent unlawful entrant who was apprehended close in time and place to his unauthorized border crossing, has no procedural due process rights to vindicate through his habeas challenge, the Court unnecessarily addresses a constitutional question in a manner contrary to the text of the Constitution and to our precedents.
The Court stretches to reach the issue whether a noncitizen like respondent is entitled to due process protections in relation to removal proceedings, which the court below mentioned only in a footnote and as an aside. See ante , at 1981 - 1982 (quoting 917 F.3d at 1111, n. 15 ). In so doing, the Court opines on a matter neither necessary to its holding nor seriously in dispute below.[11]
The Court is no more correct on the merits. To be sure, our cases have long held that foreigners who had never come into the United States-those "on the threshold of initial entry"-are not entitled to any due process with respect to their admission. Shaughnessy v. United States ex rel. Mezei , 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953) (citing Ekiu , 142 U.S. at 660, 12 S.Ct. 336 ); see also Landon v. Plasencia , 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). That follows from this Courts' holdings that the political *2012 branches of Government have "plenary" sovereign power over regulating the admission of noncitizens to the United States. Ante , at 1982 - 1983; see also Ekiu , 142 U.S. at 659, 12 S.Ct. 336.
Noncitizens in this country, however, undeniably have due process rights. In Yick Wo v. Hopkins , 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), the Court explained that "[t]he Fourteenth Amendment to the Constitution is not confined to the protection of citizens" but rather applies "to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." Id. , at 369, 6 S.Ct. 1064 ; Zadvydas v. Davis , 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (reiterating that "once an alien enters the country," he is entitled to due process in his removal proceedings because "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent").
In its early cases, the Court speculated whether a noncitizen could invoke due process protections when he entered the country without permission or had resided here for too brief a period to "have become, in any real sense, a part of our population." The Japanese Immigrant Case , 189 U.S. 86, 100, 23 S.Ct. 611, 47 L.Ed. 721 (1903) ; see also ante , at 1981 - 1982 (quoting Ekiu , 142 U.S. at 660, 12 S.Ct. 336 (remarking that for those not " 'admitted into the country pursuant to law,' " the procedures afforded by the political branches are all that are due)). But the Court has since determined that presence in the country is the touchstone for at least some level of due process protections. See Mezei , 345 U.S. at 212, 73 S.Ct. 625 (explaining that "aliens who have once passed through our gates, even illegally," possess constitutional rights); Mathews v. Diaz , 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) ("There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment ... protects every one of these persons .... Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection"). As a noncitizen within the territory of the United States, respondent is entitled to invoke the protections of the Due Process Clause.
In order to reach a contrary conclusion, the Court assumes that those who do not enter the country legally have the same due process rights as those who do not enter the country at all. The Court deems that respondent possesses only the rights of noncitizens on the "threshold of initial entry," skirting binding precedent by assuming that individuals like respondent have " 'assimilated to [the] status' " of an arriving noncitizen for purposes of the constitutional analysis. Mezei , 345 U.S. at 212, 214, 73 S.Ct. 625. But that relies on a legal fiction. Respondent, of course, was actually within the territorial limits of the United States.
More broadly, by drawing the line for due process at legal admission rather than physical entry, the Court tethers constitutional protections to a noncitizen's legal status as determined under contemporary asylum and immigration law. But the Fifth Amendment, which of course long predated any admissions program, does not contain limits based on immigration status or duration in the country: It applies to "persons" without qualification. Yick Wo , 118 U.S. at 369, 6 S.Ct. 1064. The Court has repeatedly affirmed as much long after Congress began regulating entry to the country. Mathews , 426 U.S. at 77, 96 S.Ct. 1883 ; Zadvydas , 533 U.S. at 693-694, 121 S.Ct. 2491. The Court lacks any textual basis to craft an exception to this rule, let alone one hinging on dynamic immigration *2013 laws that may be amended at any time, to redefine when an "entry" occurs. Fundamentally, it is out of step with how this Court has conceived the scope of the Due Process Clause for over a century: Congressional policy in the immigration context does not dictate the scope of the Constitution.
In addition to creating an atextual gap in the Constitution's coverage, the Court's rule lacks any limiting principle. This is not because our case law does not supply one. After all, this Court has long affirmed that noncitizens have due process protections in proceedings to remove them from the country once they have entered. See id. , at 693-694, 121 S.Ct. 2491 ; Mezei , 345 U.S. at 212, 73 S.Ct. 625.
Perhaps recognizing the tension between its opinion today and those cases, the Court cabins its holding to individuals who are "in respondent's position." Ante , at 1983. Presumably the rule applies to-and only to-individuals found within 25 feet of the border who have entered within the past 24 hours of their apprehension. Where its logic must stop, however, is hard to say. Taken to its extreme, a rule conditioning due process rights on lawful entry would permit Congress to constitutionally eliminate all procedural protections for any noncitizen the Government deems unlawfully admitted and summarily deport them no matter how many decades they have lived here, how settled and integrated they are in their communities, or how many members of their family are U. S. citizens or residents.
This judicially fashioned line-drawing is not administrable, threatens to create arbitrary divisions between noncitizens in this country subject to removal proceedings, and, most important, lacks any basis in the Constitution. Both the Constitution and this Court's cases plainly guarantee due process protections to all "persons" regardless of their immigration status, a guarantee independent of the whims of the political branches. This contrary proclamation by the Court unnecessarily decides a constitutional question in a manner contrary to governing law.[12]
IV
The Court reaches its decision only by downplaying the nature of respondent's claims, ignoring a plethora of common-law immigration cases from a time of relatively open borders, and mischaracterizing the most relevant precedents from this Court. Perhaps to shore up this unstable foundation, the Court justifies its decision by pointing to perceived vulnerabilities and abuses in the asylum system. I address the Court's policy concerns briefly.
In some ways, this country's asylum laws have represented the best of our Nation. Unrestricted migration at the founding and later, formal asylum statutes, have served as a beacon to the world, broadcasting the vitality of our institutions and our collective potential. For many who come here fleeing religious, political, or ideological persecution, and for many more who have preceded them, asylum has provided both a form of shelter and a start to a better life. That is not to say that this *2014 country's asylum policy has always, or ever, had overwhelming support. Indeed, many times in our past, particularly when the Nation's future has appeared uncertain or bleak, members of this country have sought to close our borders rather than open them. See S. Legomsky & C. Rodriguez, Immigration and Refugee Law and Policy 875-876 (5th ed. 2009) (explaining that restrictionist sentiments in the 1930s were fueled in part by the Great Depression). Yet this country has time and again reaffirmed its commitment to providing sanctuary to those escaping oppression and persecution. Congress and the Executive have repeatedly affirmed that choice in response to serial waves of migration from other countries by enacting and amending asylum laws and regulations. In fact, a centerpiece of respondent's claim is that officials were not following these statutorily enacted procedures.
The volume of asylum claims submitted, pending, and granted has varied over the years, due to factors like changing international migration patterns, the level of resources devoted to processing and adjudicating asylum applications, and amendments to governing immigration laws. See Congressional Research Service, Immigration: U. S. Asylum Policy 25 (Feb. 19, 2019); see also Dept. of Homeland Security, Office of Immigration Statistics, 2018 Yearbook of Immigration Statistics 43 (2019) (Table 16) ("Individuals Granted Asylum Affirmatively or Defensively: Fiscal Years 1990 to 2018" (quotation modified)). For the past few years, both new asylum applications and pending applications have steadily increased. Immigration: U. S. Asylum Policy, at 25.
It is universally acknowledged that the asylum regime is under strain. It is also clear that, while the reasons for the large pending caseload are complicated,[13] delays in adjudications are undesirable for a number of reasons. At bottom, when asylum claims are not resolved in a timely fashion, the protracted decisionmaking harms those eligible for protection and undermines the integrity of the regime as a whole. D. Meissner, F. Hipsman, & T. Aleinikoff, Migration Policy Institute, The U. S. Asylum System in Crisis: Charting a Way Forward 4 (Sept. 2018).
But the political branches have numerous tools at their disposal to reform the asylum system, and debates over the best methods of doing so are legion in the Government, in the academy, and in the public sphere.[14] Congress and the Executive are thus well equipped to enact a range of measures to reform asylum in a *2015 number of ways and routinely do so.[15] Indeed, as the Court notes, the expedited removal process at issue here was created by law as one such measure to ease pressures on the immigration system. Ante, at 1965 - 1966.
In the face of these policy choices, the role of the Judiciary is minimal, yet crucial: to ensure that laws passed by Congress are consistent with the limits of the Constitution. The Court today ignores its obligation, going out of its way to restrict the scope of the Great Writ and the reach of the Due Process Clause. This may accommodate congressional policy concerns by easing the burdens under which the immigration system currently labors. But it is nothing short of a self-imposed injury to the Judiciary, to the separation of powers, and to the values embodied in the promise of the Great Writ.
Because I disagree with the Court's interpretation of the reach of our Constitution's protections, I respectfully dissent.

I express no view on the question whether respondent is even entitled to the privilege of the writ as an unadmitted alien.

None of this is to say that the writ of habeas corpus involved a wide-ranging, ever-changing inquiry. As the Court today reaffirms, "the scope of habeas has been tightly regulated by statute, from the Judiciary Act of 1789 to the present day." Ante , at 1074, n. 20. A writ of habeas corpus was "in the nature of a writ of error, to examine the legality of the commitment." Ex parte Watkins , 3 Pet. 193, 202, 7 L.Ed. 650 (1830) (Marshall, C. J.). When an executive detained someone without trial, it allowed a court to "examine into [the] validity" of "the reason for" commitment. 3 W. Blackstone, Commentaries on the Laws of England 133 (1770). In cases of detention pursuant to the judgment of a court, "a prisoner seeking a writ of habeas corpus could challenge only the jurisdiction of the court that had rendered the judgment under which he was in custody." Wright v. West , 505 U.S. 277, 285, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (opinion of THOMAS, J.). In both contexts, the writ "played only a procedural role: It issued as of right when a prisoner showed probable cause to believe he was being held illegally ... and obligated the warden to file a 'return' identifying the grounds of imprisonment." Jennings v. Stephens , 574 U.S. 271, 285, 135 S.Ct. 793, 190 L.Ed.2d 662 (2015) (THOMAS, J., dissenting). When the writ of habeas corpus was granted, it "decided nothing except that there was a case calling for an answer by the gaoler." Goddard, A Note on Habeas Corpus, 65 L. Q. Rev. 30, 34 (1949). "After reviewing the reason so returned, the court could release, bail, or remand the prisoner as appropriate." J. Baker, An Introduction to English Legal History 157 (5th ed. 2019).

Mainprise or mainprize is a "writ ordering the sheriff to take ... security ... for the prisoner's appearance and release the prisoner." Black's Law Dictionary 1142 (11th ed. 2019).

It does not appear that it was necessary to expressly mention the availability of the writ in a suspending Act. Some States made express reference to the writ of habeas corpus, see, e.g., ch. 762, § 2, 9 Statutes at Large of Pennsylvania 140, but many did not.

The Court wisely declines to explore whether the Suspension Clause independently guarantees the availability of the writ or simply restricts the temporary withholding of its operation, a point of disagreement between the majority and dissent in INS v. St. Cyr , 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Ante , at 1968 - 1969, n. 12. Justice Scalia, dissenting in St. Cyr , wrote that the Suspension Clause "does not guarantee any content to (or even the existence of) the writ of habeas corpus, but merely provides that the writ shall not (except in case of rebellion or invasion) be suspended." 533 U.S. at 337, 121 S.Ct. 2271. But no majority of this Court, at any time, has adopted that theory. Notably, moreover, even Justice Scalia appears to have abandoned his position just three years later in Hamdi v. Rumsfeld , 542 U.S. 507, 555-556, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (dissenting opinion) ("The two ideas central to Blackstone's understanding-due process as the right secured, and habeas corpus as the instrument by which due process could be insisted upon by a citizen illegally imprisoned-found expression in the Constitution's Due Process and Suspension Clauses"); see also id. , at 558, 124 S.Ct. 2633 ("The writ of habeas corpus was preserved in the Constitution-the only common-law writ to be explicitly mentioned"). Even one concurring opinion seems to recognize that the Suspension Clause "protect[s] a substantive right." Ante , at 1985 (opinion of THOMAS, J.).

The Court notes "the 'delicate' relationship between England and Scotland at the time" of Murray's Case . Ante , at 1973, n. 18. Interestingly, the Court does not mention the delicate nature of the relationship between the United States and Iraq in Munaf v. Geren , 553 U.S. 674, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008), the centerpiece of the Court's argument, even though that case arose during a military conflict. Ante , at 1970 - 1971. Nor does it acknowledge the impact that the relationship had on the Munaf Court's decision to refrain from issuing the writ. See Part II-B-3, infra .

Indeed, the Court highlights a striking similarity to the present asylum challenge by observing that the foreign-deserter cases show the "use of habeas to secure release from custody when not in compliance with ... statute[s] and relevant treaties." Ante , at 1974.

The Court considers irrelevant cases demonstrating that the executive was permitted to cure defects in detention because "the legality of [respondent's] detention is not in question" here. Ante, at 1972; see also ante, at 1981 (acknowledging that it is "often 'appropriate' to allow the executive to cure defects in a detention" in habeas cases (quoting Boumediene , 553 U.S. at 779, 128 S.Ct. 2229 )). But as explained in Part I-A, supra , that is exactly what respondent questions by arguing that his detention violated governing asylum law.

Oddly, the Court embraces Munaf -a recent decision involving detainees held outside the territorial limits of the United States who were subject to prosecution by a foreign sovereign-to support its conclusion about the availability of habeas review. Yet at the same time, it dismisses respondent's reliance on Boumediene v. Bush , 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), outright on the grounds that the case is "not about immigration at all." Ante , at 1981, 103 S.Ct. 321.

Nor is the Court correct in dismissing common-law extradition precedents as inapposite because they show "nothing more than the use of habeas to secure release from custody." Ante , at 1974. Indeed, these extradition cases demonstrate that the common-law writ encompassed exactly the kind of permission to remain in a country that the Court claims falls outside its scope. Ante , at 1969, 1970 - 1971. In re Stupp, 23 F.Cas. 296, (No. 13563) (CC SDNY 1875), which the Court cites in passing, emphatically affirmed that habeas corpus was available to challenge detention pending extradition: "[T]he great purposes of the writ of habeas corpus can be maintained, as they must be. The court issuing the writ must inquire and adjudge whether the commissioner acquired jurisdiction ... and had before him legal and competent evidence of facts whereon to pass judgment as to the fact of criminality, and did not arbitrarily commit the accused for surrender." Id. , at 303. Although the Stupp court did not ultimately issue the writ, other courts have. See, e.g. , Ex parte Kaine , 14 F.Cas. 78, 82 (No. 7,597) (CC SDNY 1853) (granting the writ to a prisoner whose detention was "in consequence of illegality in the proceedings under the [extradition] treaty"); Pettit v. Walshe , 194 U.S. 205, 219-220, 24 S.Ct. 657, 48 L.Ed. 938 (1904) (affirming a grant of habeas where a prisoner's detention violated the terms of an extradition treaty with Great Britain); In re Washburn , 4 Johns.Ch. 106, 114 (N. Y.Ch. 1819) (granting a habeas petition of a noncitizen after a request for extradition); People v. Goodhue , 2 Johns.Ch. 198, 200 (N. Y.Ch. 1816) (releasing prisoner subject to possible interstate extradition). These extradition-related habeas cases show that the writ was undoubtedly used to grant release in the very direction-that is, away from a foreign country and into the United States-that the Court today derides. Indeed, the same scholar the Court cites makes the point that extradition specifically allowed courts to hear challenges to the Executive's ability to "detain aliens for removal to another country at the request of [the] government." Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961, 1003 (1998).

These claims are uncannily reminiscent of the kinds of claims respondent advances here. See Parts II-A and II-B, supra .

The Court also claims that because Ekiu stated that the 1891 Act was constitutional, respondent must be wrong that Ekiu found the 1891 Act "unconstitutional in most of its applications (i.e. , to all questions other than questions of fact)." Ante , at 1978. But the point here is not that Ekiu actually found the 1891 Act unconstitutional in part; it is that Ekiu interpreted the 1891 Act to avoid rendering it unconstitutional in part.

See, e.g. , The Japanese Immigrant Case , 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721 (1903) (habeas petition filed by noncitizen alleged to have entered unlawfully and apprehended four days after being let on shore); Gonzales v. Williams , 192 U.S. 1, 24 S.Ct. 177, 48 L.Ed. 317 (1904) (habeas petition filed by resident of Puerto Rico detained at the port, who claimed that Puerto Rican nationals are United States citizens allowed to enter the mainland as a matter of course); United States ex rel. Turner v. Williams , 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979 (1904) (habeas petition by noncitizen found within the United States 10 days after entry alleging his arrest was unconstitutional); Chin Yow v. United States , 208 U.S. 8, 28 S.Ct. 201, 52 L.Ed. 369 (1908) (habeas petition filed by a Chinese individual with a claim of U. S. citizenship who was detained on a steamship and prohibited from disembarking); Yee Won v. White , 256 U.S. 399, 41 S.Ct. 504, 65 L.Ed. 1012 (1921) (habeas petition filed on behalf of noncitizen wife and child denied admission to the United States upon arrival despite claiming legal right to join a family member residing in the country); Tod v. Waldman , 266 U.S. 113, 45 S.Ct. 85, 69 L.Ed. 195 (1924) (habeas petition by family fleeing religious persecution in Russia denied entry on the grounds that they were likely to become a public charge); United States ex rel. Polymeris v. Trudell , 284 U.S. 279, 52 S.Ct. 143, 76 L.Ed. 291 (1932) (habeas petition filed by residents of Greek ancestry who left the United States and sought reentry after a lengthy trip abroad).

Indeed, the Government itself embraced that position in a brief to the Court during that time. Brief for Respondent in Martinez v. Neelly , O. T. 1952, No. 218, p. 19 ("The clear purpose of this [finality] provision was to preclude judicial review of the Attorney General's decisions in alien deportation cases insofar as the Congress could do so under the Constitution"); id. , at 33 ("[T]he courts have long recognized" the finality provisions "restric[t] review of deportation orders as far as the Constitution permits"); see also id. , at 18 (explaining that the finality provisions "precluded judicial review of deportation orders except for the collateral review in habeas corpus which the Constitution prescribes in cases of personal detention").

While the Court contends that the writ of habeas corpus does not allow an individual to "obtain administrative review" or additional procedures, it arrives at this conclusion only in the context of discussing what sorts of "relief " properly qualified as release from custody at common law. Ante , at 1963 - 1964, 1970 - 1972 (contrasting request for additional remedies with a "simple" release from custody). To the extent that this discussion necessarily prohibits federal courts from entertaining habeas petitions alleging due process violations in expedited removal proceedings, the Court's separate discussion in Part IV is unnecessary.

The Court notes that noncitizens like respondent seeking legal admission lack due process rights " 'regarding [their] application.' " Ante , at 1981 - 1982 (quoting Landon v. Plasencia , 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) ). It does not, however, explain what kinds of challenges are related to one's application and what kinds are not. Presumably a challenge to the length or conditions of confinement pending a hearing before an immigration judge falls outside that class of cases. Because respondent only sought promised asylum procedures, however, today's decision can extend no further than these claims for relief.

In 2018 Senate Judiciary Committee hearings, the Director of the Executive Office of Immigration Review identified factors contributing to the backlog of cases, including lengthy hiring times for new immigration judges and the continued use of paper files. See Testimony of James McHenry, Strengthening and Reforming America's Immigration Court System, Hearings before the Subcommittee on Border Security and Immigration of the Senate Committee on the Judiciary, 115th Cong., 2d Sess., 2 (2018). The Court, meanwhile, insinuates that much of the burden on the asylum system can be attributed to frivolous or fraudulent asylum claims. See, e.g. , ante , at 1963, 1966 - 1967, nn. 9 and 10. But the magnitude of asylum fraud has long been debated. See S. Legomsky & C. Rodriguez, Immigration and Refugee Law and Policy 1034 (5th ed. 2009); Immigration: U. S. Asylum Policy, at 28.

See, e.g., GAO, Immigration Courts: Actions Needed To Reduce Case Backlog and Address Long-Standing Management and Operational Challenges (GAO-17-438, June 2017); Uchimiya, A Blackstone's Ratio for Asylum: Fighting Fraud While Preserving Procedural Due Process for Asylum Seekers, 26 Pa. St. Int'l L. Rev. 383 (2007); Martin, Reforming Asylum Adjudication: On Navigating the Coast of Bohemia, 138 U. Pa. L. Rev. 1247 (1990).

P. Alvarez & G. Sands, Trump Administration Proposes Sweeping Changes to U. S. Asylum System in New Rule, CNN, June 10, 2020 (online source archived at www.supremecourt.gov).